31]          JANUARY TERM, 1913.          121

Appleton Water Works Co. v. Railroad Commission, 154 Wis. 121.

APPLETON WATER WORKS COMPANY, Appellant, vs. RAIL-
ROAD COMMISSION OF WISCONSIN, Respondent.
SAME, Respondent, vs. SAME, Appellant.

*May 13—May 31, 1913.*

*Public utilities: Purchase of water works by city: "Just compensa-
tion:" Interest: Costs in action to alter award: Elements of
value: Indeterminate permit: Cost of reproducing plant: "Going
value:" Evidence: Method by which Railroad Commission
reached its decision: Acceptance of amount of award pending
action to alter it: Waiver of rights.*

1. In a proceeding before the Railroad Commission brought by a
   municipal corporation under sec. 1797m—82, Stats. 1911, for
   the purpose of fixing the compensation to be paid for a water
   works plant operated by a public utility corporation under an
   indeterminate permit, the Commission must award "just com-
   pensation," which means fair and reasonable value at the time
   possession of the property is actually taken. Though, under
   the provisions of the law, payment may be deferred in the dis-
   cretion of the Commission for a reasonable time after posses-
   sion is taken, legal interest must in that case be provided for
   in the order from that time until the payment is made in
   order to constitute "just compensation."

2. The order in such a case cannot rightly require the municipal-
   ity to pay, in addition to such just compensation, the costs of
   an action which may be thereafter brought by the utility cor-
   poration against the Commission to alter or amend the order,
   whether such action be successful or not.

3. No allowance can be rightly made in such order for the value
   of the indeterminate permit, for the reason that such permit
   has ceased to exist.

4. If the Commission in reaching its conclusion as to "just com-
   pensation" takes into consideration, in connection with other
   data bearing thereon, an estimate of the present cost of repro-
   duction of the plant, such estimate cannot rightly include the
   cost of work which may be legally assessed, and in the exer-
   cise of good business judgment ought to be assessed, against
   the consumer; *e. g.* in the present case, the cost of trenching,
   and of breaking up and relaying permanent pavements for the
   laying of new service pipes from the main to the corporation
   cock in the curb.

5. "Going value" is that element of value which comes from the fact that the business is a going concern. It is not franchise value nor the value of good will. It is difficult to separate or measure in dollars, because the value of the plant and business is inherently indivisible, and this latter value is obtained by taking a comprehensive view of each and all of the elements of property, tangible and intangible, including property rights, and considering them as inseparable parts of a harmonious entity, and exercising the judgment as to the value of that entity. In this way the "going value" goes into the final result.

6. In an action brought under sec. 1797m—83 *et seq.* to alter or amend the order of the Commission, testimony of the commissioners as to what transpired on the hearing or during their deliberations cannot be introduced to impeach their award, nor can they be examined as to the mental processes by which they reached their results, the relative importance given by their minds to each element of value, or the legal and economic principles which they deemed to have a bearing on the result. Where the record is silent, however, they may be sworn to show what issues they considered, what matters of fact were actually submitted and passed upon, and sometimes to show that they acted under mistake of fact as to the issues submitted to them.

7. In the action named in the last subdivision there is no trial *de novo* of the whole matter of just compensation, but the court only examines into and decides upon the specific claims of error or unreasonableness made by the plaintiff; hence in this action brought by the utility company, claiming error in that the award was too small in certain particulars, there could be no reduction of the award, and the acceptance by the plaintiff of the amount of the award pending the action was not a waiver of the right to further prosecute the same.

8. It appears that during the proceedings to fix compensation before the Commission the plaintiff corporation was placed in the hands of a receiver appointed in a combined foreclosure and creditors' action in the proper federal court, and that upon petition of the city to that court and by consent of the receiver and the plaintiff corporation an order was entered by the court November 29, 1911, directing the receiver to surrender the plant to the city December 1, 1911, and requiring the city to pay the sum awarded by the Commission as compensation on or before February 7, 1912. *Held,* that the receipt of the money pursuant to this order did not operate to waive the right to interest on

the award· from the date of the turning over of the plant, it appearing from the petition of the city that the intention of the parties was that the payment should not affect the rights of the parties in this action.

[Syllabus by WINSLOW, C. J.]

APPEALS from a judgment of the circuit court for Dane county: BYRON B. PARK, Judge. *Affirmed in part; reversed in part.*

This is an action brought under the Public Utility Act to alter or amend an order of the *Railroad Commission* fixing the compensation to be paid by the city of Appleton for the taking of the plaintiff's water works plant in that city.

The works were constructed in 1882, pursuant to an ordinance passed by the city council in 1881 authorizing the use of the streets and making a contract for water service for twenty years. The plaintiff acquired title to the works in 1892, and in 1907 filed a declaration under sec. 1797m—77, Stats., surrendering its franchise, and obtained an indeterminate permit under the utility act.

In January, 1908, the city applied to the *Railroad Commission* for an order requiring the plaintiff to make its service more adequate and fixing rates, and during the same month one J. A. Hawes was appointed receiver of the company in a creditors' action in the United States court. In May, 1910, the *Commission* made an order requiring improvements to be made in the plant and postponing the fixing of rates until the improvements were made. In July, 1910, an election was called to determine whether the city should purchase the plant, which election was held August 23, 1910, and resulted in a majority for the purchase. In September the city filed with the *Commission* and served on the plaintiff notice of the result of the election, and the *Commission* set a time for hearing. At the hearing in October following all the evidence introduced in the rate case was

received by stipulation, together with some additional evidence. December 7, 1910, the *Commission* made its order fixing the value of the entire property at $255,000, and directing that the city pay said sum to the receiver on or before July 1, 1911, "provided, however, that if an action be commenced and prosecuted to alter or amend this order herein made, as prescribed in section 1797m—83, the time within which such payment shall be made as aforesaid be and the same is extended for a period of six months after the final determination of such action."

The plaintiff seasonably brought the present action under secs. 1797m—83 to 1797m—87 to alter and amend said order, and after the same was commenced the complainants in the creditors' action in the federal court, together with the receiver, Hawes, filed an ancillary bill in that court against the water company, the *Commission,* and the city of Appleton to vacate the purchase proceeding entirely and enjoin the trial of the present action. That court refused to grant the injunction and the ancillary action was dismissed. The receiver during this time remained in possession of the property and operated the plant. The foreclosure of a $250,000 mortgage on the works had also been commenced in the federal court and consolidated with the creditors' action, and Mr. Hawes had also become receiver in the foreclosure action. On November 29, 1911, upon petition of the city addressed to the federal court, an order was made by that court, with the consent of the plaintiff and the receiver, directing that the receiver surrender the plant to the city December 1, 1911, and that the city pay the receiver $255,000 therefor on or before February 1, 1912, which time was subsequently extended by order of the court to the 7th of the same month, on which date the entire sum was paid to the receiver.

Upon the trial of this action plaintiff contended that the compensation fixed by the *Commission* was unlawful in the following particulars:

First.   That it did not include interest from the time the city should take possession until payment of the compensation;

Second.   That it did not include costs and disbursements of the plaintiff in case judgment should be rendered in favor of the plaintiff in an action brought by it pursuant to secs. 1797m—83 to 1797m—86 inclusive, to alter and amend the order of the *Commission;*

Third.   That it did not include the value of the indeterminate permit or franchise of the plaintiff;

Fourth.   That it did not include the value arising from the existence of permanent pavements over service pipes;

Fifth.   That it did not include the value arising from the cost of excavating and filling trenches in which to lay 252 service pipes; and

Sixth.   That the going value determined by the *Commission* and included in the amount fixed by it was based upon improper considerations and was inadequate in amount.

On the first five of these propositions the circuit court held with the plaintiff and on the sixth with the defendant, and rendered judgment that the *Railroad Commission* alter and amend its previous order in accordance with the conclusions so reached.   Both parties appeal.

For the plaintiff there was a brief by *Lines, Spooner, Ellis & Quarles,* and oral argument by *George Lines.*   As to the nature and measure of going value, they cited *Nat. W. W. Co. v. Kansas City,* 62 Fed. 853; *Kennebec W. Dist. v. Waterville,* 97 Me. 185, 54 Atl. 6, 60 L. R. A. 856; *Brunswick & T. W. Dist. v. Maine W. Co.* 99 Me. 371, 59 Atl. 537; *Newburyport W. Co. v. Newburyport,* 168 Mass. 541, 47 N. E. 533; *Gloucester W. S. Co. v. Gloucester,* 179 Mass. 365, 60 N. E. 977; *Norwich G. & E. Co. v. Norwich,* 76 Conn. 565, 57 Atl. 746; *Galena W. Co. v. Galena,* 74 Kan. 644, 87 Pac. 735; *Pioneer T. & T. Co. v. Westenhaver,* 29 Okla. 429, 118 Pac. 354; *Spring Valley W. W. Co. v. San Francisco,*

124 Fed. 574; *C. H. Venner Co. v. Urbana W. W. Co.* 174 Fed. 348; *Des Moines W. Co. v. Des Moines,* 192 Fed. 193; *Omaha v. Omaha W. Co.* 218 U. S. 180, 30 Sup. Ct. 615. They also contended, *inter alia,* that an indeterminate permit is a franchise which continues in force until the municipality exercises its option to purchase or it is otherwise terminated by law. Sub. 5, sec. 1797m—1, Stats.; *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530; *Calumet S. Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131. It is a property franchise as distinguished from a corporate franchise and is not within the power of repeal reserved to the legislature in the constitution. *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, 560; *State ex rel. Att'y Gen. v. Portage City W. Co.* 107 Wis. 441, 83 N. W. 697; *Linden L. Co. v. Milwaukee E. R. & L. Co.* 107 Wis. 493, 83 N. W. 851; *In re Southern Wis. P. Co.* 140 Wis. 245, 122 N. W. 801; *Water Power Cases,* 148 Wis. 124, 134 N. W. 330; *Calumet S. Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131. That such a franchise is a thing of value is beyond question; that it is taken from the plaintiff when the city takes its physical property used in connection with it, is equally certain; and it is settled by the authorities without conflict that being so taken its value must be included in the just compensation, required alike by the constitution and the statute. *Monongahela N. Co. v. U. S.* 148 U. S. 312, 343, 13 Sup. Ct. 622; *Willcox v. Consolidated G. Co.* 212 U. S. 19, 44, 29 Sup. Ct. 192; *Kennebec W. Dist. v. Waterville,* 97 Me. 185, 54 Atl. 6; *People v. O'Brien,* 111 N. Y. 1, 18 N. E. 692; *Monongahela W. Co. Case,* 223 Pa. St. 323, 72 Atl. 625; *Brunswick & T. W. Dist. v. Maine W. Co.* 99 Me. 371, 59 Atl. 537; *Montgomery Co. v. Schuylkill B. Co.* 110 Pa. St. 54, 20 Atl. 407; Whitten, Val. Pub. Serv. Corp. ch. XXVI, pp. 572—591. And the fact that the franchises of the plaintiff were subject to be taken under the act, in no respect destroys or impairs their

value to the plaintiff and cannot diminish or affect the amount to be awarded as just compensation therefor. *Kennebec W. Dist. v. Waterville,* 97 Me. 185, 54 Atl. 6, 20.

For the defendant there was a brief by the *Attorney General* and *Walter Drew,* deputy attorney general, with *George G. Greene* and *Jerome R. North,* of counsel; and the cause was argued orally by *Mr. Greene, Mr. North,* and *Mr. B. R. Stebbins,* assistant attorney general. They argued, among other things, that the indeterminate permit was not unlawfully excluded in valuation. Plaintiff's franchise to operate expired by its terms when the city exercised its option to buy. *In re Appleton W. W. Co.* 6 Wis. R. R. Comm. Rep. 97, 118; *Calumet S. Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131; *Knoxville W. Co. v. Knoxville,* 200 U. S. 22, 36, 26 Sup. Ct. 24; *Helena W. W. Co. v. Helena,* 195 U. S. 383, 392, 25 Sup. Ct. 40; *Appleton W. W. Co. v. Appleton,* 132 Wis. 563, 113 N. W. 44; *S. C.* 136 Wis. 395, 117 N. W. 816. If the indeterminate permit by its terms did not expire on purchase by the city, compensation for any unexpired term of it would not be just. (1) Apart from the terms of such permit, the state had power, at the time of purchase, to terminate any unexpired franchise without compensation. Plaintiff was formed under general laws. A corporation is formed by the statutes and their amendments which incorporate it and confer upon it its powers and rights. These together are its charter which forms it and, by the provision, may be altered or repealed. *Northern Cent. R. Co. v. Maryland,* 187 U. S. 258, 268 *et seq.,* 23 Sup. Ct. 62; *Stanislaus Co. v. San Joaquin & K. R. C. & I. Co.* 192 U. S. 201, 211, 24 Sup. Ct. 41; *West Wis. R. Co. v. Trempealeau Co.* 35 Wis. 257; *Att'y Gen. v. Railroad Cos.* 35 Wis. 425; *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 28, 29, 129 N. W. 925; *Mo. Pac. R. Co. v. Kansas,* 216 U. S. 262, 274, 30 Sup. Ct. 330. (2) Plaintiff should not be paid for any right

to do increased business in the future because, under the utility act, such business would be no benefit to it. *Stanislaus Co. v. San Joaquin & K. R. C. & I. Co.* 192 U. S. 201, 216, 24 Sup. Ct. 41; *Des Moines W. Co. v. Des Moines,* 192 Fed. 199; 2 Wyman, Pub. Serv. Corp. § 1133. Even when at the time of purchase or condemnation there is an unexpired franchise, unalterable as to duration, but rates must be kept to give reasonable return on investment, the only function of franchise to affect value is to give the structure and business *as they are when taken* their value in rightful use. *Cedar Rapids G. L. Co. v. Cedar Rapids,* 144 Iowa, 426, 120 N. W. 966, affirmed 223 U. S. 655, 669, 32 Sup. Ct. 389; *Spring Valley W. W. Co. v. San Francisco,* 192 Fed. 137, 138; *Contra Costa W. Co. v. Oakland,* 159 Cal. 323, 113 Pac. 668, 676; *Des Moines G. Co. v. Des Moines,* 199 Fed. 204; Whitten, Val. Pub. Serv. Corp. §§ 630, 631; *Brunswick & T. W. Dist. v. Maine W. Co.* 99 Me. 371, 378, 59 Atl. 537. The going-concern element of value was given due effect by the *Commission. Cedar Rapids W. Co. v. Cedar Rapids,* 118 Iowa, 234, 262, 91 N. W. 1081; *Omaha v. Omaha W. Co.* 218 U. S. 180, 202, 30 Sup. Ct. 615; *Brunswick & T. W. Dist. v. Maine W. Co.* 99 Me. 371, 59 Atl. 537; *Gloucester W. S. Co. v. Gloucester,* 179 Mass. 365, 60 N. E. 977; *Norwich G. & E. Co. v. Norwich,* 76 Conn. 565, 57 Atl. 746; *Cedar Rapids G. L. Co. v. Cedar Rapids,* 144 Iowa, 426, 120 N. W. 966; *Eau Claire v. Eau Claire W. Co.* 137 Wis. 517, 526, 119 N. W. 555; *State ex rel. N. C. Foster L. Co. v. Williams,* 123 Wis. 61, 69, 100 N. W. 1048; *Spring Valley W. W. Co. v. San Francisco,* 192 Fed. 167. The *Commission* had to consider, *as evidence,* the cost of original production and of reproduction less depreciation, the character, condition, and efficiency of the structure, its economical fitness for the service, the extent and kind of its business, its earning power, etc., to determine the single value of the entirety.

The ultimate question and all of the interdependent questions lay in opinion. And the *Commission* was not restricted to such evidence. As it was constituted for use of the knowledge and experience of its members, they could use such knowledge and experience in forming their opinion. *Interstate Comm. Comm. v. U. P. R. Co.* 222 U. S. 541, 547, 32 Sup. Ct. 108; *Chicago, B. & Q. R. Co. v. Babcock,* 204 U. S. 585, 27 Sup. Ct. 326; *Eau Claire v. Eau Claire W. Co.* 137 Wis. 517, 119 N. W. 555; *Bristol v. Branford,* 42 Conn. 321; *Matter of Brooklyn U. E. R. Co.* 188 N. Y. 553, 99 N. Y. Supp. 222; *Matter of Staten Island R. T. Co.* 47 Hun, 396; *Columbia D. B. Co. v. Geisse,* 35 N. J. Law, 474. On the question of value, the opinion of the original trier, be it an administrative or judicial body, is conclusive on appeal or any kind of review. 1 Sutherland, Dam. 803; 2 Lewis, Em. Dom. (3d ed.) § 654; *Peoria, B. & C. T. Co. v. Vance,* 234 Ill. 36, 84 N. E. 607; *Brewer v. Tyringham,* 12 Pick. 547.

WINSLOW, C. J. A preliminary objection is urged by the defendant which, if sustained, would require a reversal of the entire judgment below, without regard to the merits. This objection is in brief that the plaintiff and its receiver, by accepting the $255,000 award pending this action, have waived the right to challenge the lawfulness of the award or further prosecute the action.

The contention must be sustained if the matter is opened up for a new trial on the merits by this action and if the result may be a reduction of the award. *Grand Rapids v. Bogoger,* 141 Wis. 530, 124 N. W. 659. This simply involves consideration of the sections which authorize and define this action and determination of the legislative intent. Sec. 1797m—83 provides that either the municipality, the utility, or any creditor of the utility may prosecute the action "to alter or amend" the order of the *Commission.* Sec.

1797m—84 provides that if such plaintiff shall not establish to the full satisfaction of the court that the compensation fixed is unlawful or some of the terms or conditions unreasonable, the compensation, terms, and conditions fixed by the *Commission* shall be paid, followed, and observed in the purchase. Sec. 1797m—85 provides that if the plaintiff shall establish to the full satisfaction of the court and the court shall adjudge that the compensation is unlawful, or some of the terms and conditions unreasonable, the court shall remand the same to the *Commission* with findings of fact and conclusions of law, setting forth in detail the reasons for the judgment and the *specific particulars* in which the order is adjudged to be unreasonable or unlawful. Sec. 1797m—86 provides that in such event the *Commission* shall at once set a rehearing for the redetermination of the compensation as in the first instance, and shall forthwith otherwise alter the previous order with or without rehearing as they deem necessary, so that it shall be lawful and reasonable in every particular.

It must be admitted that the language here is not as clear as might be wished, but we think the most reasonable construction of the various sections leads to the conclusion that the subject is not in any event to be opened up for a trial *de novo,* but only that the court is to examine into the specific claims of error or unreasonableness made by the plaintiff in the action and decide whether such specific claims or any of them are satisfactorily established, and, if so, is to make findings to that effect, setting forth in detail the reasons therefor and the "specific particulars" in which the order is held to be unreasonable or unlawful, and remand the matter to the *Commission* for correction of the order in these particulars. If this be the correct conclusion, then it is manifest that the court could not in this action brought by the utility corporation reduce the amount of the award, and from this it follows

31]     JANUARY TERM, 1913.     131

Appleton Water Works Co. v. Railroad Commission, 154 Wis. 121.

that the acceptance of the amount of the award was not a waiver of the right to prosecute this action.

We shall take up the questions presented in the order in which they are stated in the statement of facts.

1. As to the matter of interest on the award. The law requires (sec. 1797m—82) the award of "just compensation." In the present case the *Commission* awarded $255,000 to be paid July 1, 1911, and further provided that if an action should be brought to alter or amend the order the time for payment should be extended for a period of six months after the final determination of the action.

We have been entirely unable to see how this latter provision of the order can be justified. It in effect penalizes the plaintiff for exercising a statutory right. Just compensation must mean fair and reasonable value at the time the property is taken. Just compensation for property presently taken must necessarily mean its present value presently paid. It cannot mean its present value to be paid two years in the future without interest. If payment is not to accompany the taking, but is to be postponed to a later period, it must certainly be upon the payment of interest for the deferred period. The statute evidently contemplates that the *Commission* shall fix the time when the property shall be delivered to the municipal authorities, as well as the time when and the manner in which payment shall be made. All this is evidently included within the words "terms and conditions of sale and purchase." It is evident that the intention was to give the *Commission* ample power to fit the terms and conditions to the circumstances in each particular case. Deferred payment for a reasonable period may doubtless be provided for if the financial condition of the municipality seems to call for such a provision, but in such case interest from the time of the taking of the property must be also provided for if "just compensation" is to be attained.

In the present case, therefore, the provisions of the order of the *Commission* which provide that if the present action should be commenced the time of payment should be postponed until six months after the final determination of the action cannot be approved. If the time when the property was to be turned over and the compensation was to be paid was not to be definitely fixed by the order, it should at least have been provided that for such time as payment should be delayed after possession of the property was taken by the city interest at the legal rate should be paid, and this regardless of the question whether any action should be brought or not.

As matter of fact, in the present case the receiver retained possession of the property until December 1, 1911, when he surrendered possession to the city under the provisions of the order made by the federal court directing him to surrender possession at that time, and requiring the city to pay the award by February 1, 1912 (afterwards enlarged to February 7th). For this period of two months the circuit court held that interest must be allowed, and as we think correctly on the principles which have just been laid down. It is argued by the defendant that because the receiver and the plaintiff consented to the entry of this order on the plaintiff's petition there resulted a waiver of all claims for interest.

It is said that when the principal of a debt is paid and accepted as payment of the debt in full, the right to interest is thereby waived. Whether this be a correct principle or not, it does not apply to the circumstances here present. It is entirely clear in this case that there was no intention on either side, when the payment of the $255,000 was agreed upon, that there should result thereby any change in the rights of the parties, or any difference in the result of this action, but rather the contrary.

In the petition of the city upon which the consent order

was made, the city states, as one of the reasons why the order should be made, "That said city has at all times been ready and willing, and is now ready and willing, to pay the valuation fixed by said *Railroad Commission* as aforesaid, or any other valuation that may be fixed by said order as amended in said suit in said state court, if the same is amended, and that by the vote of its electors at said election of August, 1910, set out in said ancillary bill, said city has pledged itself to pay whatever the final award may be."

The intention to preserve the status of the questions involved in this litigation in exactly the same condition as before, notwithstanding the payment and receipt of the award, could hardly be more plainly stated. It was this sort of a payment, namely, a payment which left its rights intact in the litigation to which consent was given, and none other. The circuit court was therefore right in its holding that interest from the time of the surrender of possession of the works until payment should actually be made should have been provided for in the order of the *Commission*.

2. The circuit court held that the *Commission* should have included in its order a provision that the city of Appleton should pay plaintiff's costs and disbursements in case judgment should be rendered in its favor in an action brought by it to alter or amend the order. The evident result of this part of the judgment is that the city of Appleton is compelled to pay the costs of an action to which it is not a party. This seems a singular proposition at first blush, but the argument in its favor is not without force, and is in substance as follows: The proceeding before the *Commission* is in substance and effect a condemnation proceeding. In case the award of the *Commission* is too small, the action brought to alter and amend that award is the only means by which the plaintiff can secure that full and just compensation for his property taken which the constitution and the law guarantee to him.

This court has held in *Stolze v. M. & L. W. R. Co.* 113 Wis. 44, 88 N. W. 919, that just compensation within the meaning of the constitution must include the reasonable costs and disbursements of such legal proceedings as the landowner is compelled to take to secure the ascertainment and payment of such compensation. Inasmuch as no costs can be taxed against the *Railroad Commission* and the city is not a party to this action, the only way in which the law can be made constitutional is to incorporate in the original order a provision that the city pay the costs of a successful action of this nature.

The *Stolze Case* was a case where property had been taken by adversary condemnation proceedings by a railroad company which became bankrupt, and went into the hands of a receiver before payment of the amount finally adjudged. The property was taken possession of by another company and used for railroad purposes. The landowner commenced proceedings under the statute to sequestrate the assets of the first-named corporation and incurred large costs in such proceedings, but was unable to obtain satisfaction. He then brought action against the second railroad company to restrain it from using the property until full compensation had been made to him therefor. The latter company paid into court the amount of the award and contended that no more could be required of it, but this court held that the landowner was entitled to have paid to him the costs in the sequestration proceedings, as well as interest on the award and the costs of the equitable action, and to an injunction restraining the second company from using the land for railway purposes until such payment was made. This was on the ground that a law which throws upon the property owner the burden of paying the costs necessarily incurred by him in ascertaining and securing payment of just compensation for his property when condemned would be unconstitutional.

We are entirely satisfied with that decision, but do not

consider it applicable to the present case. That was purely an adversary proceeding. The landowner consented to nothing, but was compelled to bring action after action to obtain his compensation, and if it were held that he must subtract from that compensation the costs of the litigation which he was forced to bring in order to secure its payment, it would be very apparent that he would be deprived of a substantial part of the just compensation which the constitution guarantees to him. When, however, a public utility company elects to surrender its franchise and receive an indeterminate permit under the utilities law, it consents to sell its plant to the city at any time when the city desires to take it, and consents also that it will abide by the provisions of the utilities law as to the method of securing its compensation. In effect, it embodies all the provisions of the utilities law bearing on the subject into its consent, and agrees to be bound by them. Whether the proceedings by which the compensation is ascertained under the utilities law be called condemnation proceedings or not is a matter of little moment. The property owner has voluntarily consented to be bound by them, and is in no position to complain of them.

Nowhere in the law do we find any provision, express or implied, authorizing the *Commission* to include such costs in its order. As we have before said, the words "just compensation" as used in this law plainly mean fair and reasonable value at the time of the taking, and it seems that it would be taking an unwarranted liberty with plain language to hold that the words include also the costs of an action which presumably will never be brought, and will never be necessary if the *Commission* does its full duty. Costs are a creature of the statute, and are withheld unless the statute affirmatively grants them. This statute withholds them. Grant that such a statute would be unconstitutional under the principles of the *Stolze Case* in adversary proceedings for condemnation, it is entirely within the power of the property owner to waive

his constitutional right, and this he can easily do by voluntarily consenting to sell his property to the city at its option and rely for his compensation upon the remedy which the statute gives, which in this case is an action in which if successful he recovers no costs. We conclude that the circuit court was wrong upon this proposition.

3. Should there be an allowance made for the value of the indeterminate permit? The *Commission* held that it had no value, but the circuit court held that it necessarily had some value, if nothing more than a nominal value, and that the *Commission* must ascertain that value and consider it in fixing the just compensation.

Upon this question we quite agree with the *Commission.* The privilege or right called an indeterminate permit, which was first brought into our jurisprudence by the Public Utilities Law, is simply an authority granted by the state to a given public utility to do business in a certain community, subject to all proper legislative action, either as a monopoly or in competition with other utilities, as the case may be, or as the *Commission* may deem for the public welfare, until such time as the municipality chooses to exercise its right of purchase. When this right of purchase has been exercised by giving the statutory notice, the authority to transact business is gone by its very terms. The element of value which remains in such a thing as this after its existence has been forever terminated is difficult to perceive. It is much like a franchise for a term of years after the term of years has expired. The *Railroad Commission* considered this question in 1908 (*In re Cashton L. & P. Co.* 3 Wis. R. R. Comm. Rep. 67), and treated it as follows:

"Obviously, the term of the indeterminate permit is indefinite and limited only by the happening of the event specified in the statute. The moment the municipality exercises its option to purchase the plant of a public utility operating under an indeterminate permit, the life of such permit is ter-

minated, and henceforth the same possesses no more value than a franchise for a definite term of years upon the expiration of the term. It is manifestly the purpose of the law to relieve a municipality of any and all obligation to make compensation for the privilege of doing business, granted to a public utility, when the municipality determines to acquire the property of such public utility. As the company's privilege of continuing in business has expired, no compensation can be awarded for a right that no longer exists."

It is said by the plaintiff in criticism of the foregoing that this court has in two cases held that the aim of this legislation was to secure uniformity in public utility franchises (*La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530; *Calumet S. Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131), and that it must follow that there was no purpose to avoid the making of compensation for the value of an unexpired franchise. This conclusion does not by any means follow. There was doubtless desire to obtain uniformity of rates and service and privilege, to establish order in the place of infinite confusion, to eliminate the peculiarities and inequalities existing in the various municipalities of the state, and reach a point where the public should obtain like service on terms of substantial equality in all municipalities, so far as such a result could be obtained; but it does not by any means follow that this was the only object in the mind of the legislature. The elaborate provisions made for the acquiring of title to such utilities by the municipalities themselves leave no doubt that ultimate public ownership was an idea very much in mind, and that the advantages resulting to the public from the possession of an option to purchase at any time must have been in view. One of those advantages plainly is that there can be no unexpired franchise to be considered or allowed for in case of purchase. To speak of a nonexistent right having value seems a solecism. An indeterminate permit doubtless has value so long as it is in force, depending on

the extent of the business, the prospects of growth in the municipality, and the likelihood of its termination in the future by the exercise of the city's option, and other considerations which will occur to any mind. But when the guillotine has fallen on the right, and it becomes but a memory, can it be logically said to have even a nominal value? We have been unable to answer this question in the affirmative.

4 and 5. The question whether, in estimating the present value of the plant and business, the *Commission* should have taken into consideration the value of the existing permanent pavements over service pipes and the cost of excavating and filling trenches in which to lay service pipes is next to be determined. In order that this question may be clearly understood, a brief statement of facts is necessary. At the time of the taking over of the plant there were 1,827 service pipes attached to the mains. The company had dug and refilled 1,575 of these trenches at its own expense, and patrons had dug and refilled 252 of them under a rule of the company in force during the latter part of its business life, requiring the prospective consumer to pay for such cost. The service pipe here spoken of is that section of pipe between the main and the corporation cock at the curb line. The company has always furnished the curb box, corporation cock, lead connections, curb cocks and fittings, and performed all the work of making the connections, and formerly furnished the pipe and did the excavating, but since the establishment of the new rule above mentioned the consumer has been required to supply the pipe and do the excavating and filling.

The question comes into the case in this way: The *Commission* procured from their engineers a careful estimate of the cost of reproducing the plaintiff's plant at the prevailing prices at the time of the decision, and of the present value of the physical property based on such estimated cost of reproduction, and used these estimates as important, but not controlling, factors in reaching their final decision as to the just

compensation which should be paid. The estimate so made of the actual cost of reproduction amounted to $282,091, and the estimate of present physical value based on the cost amounted to $242,127. In these estimates the cost of cutting through and relaying permanent pavement over the mains of the company in all streets where such pavements existed, amounting to over $17,000, was inserted and included in the totals, but the cost of relaying pavements over the service pipes aforesaid (estimated to amount to $7,000) was not inserted or considered.

The plaintiff's contention is that if cost of reproduction is to be considered it must rightfully include the expenses of opening and relaying the pavement over service pipes as well as over mains, and also the expense of excavating and filling the trenches for service pipes. The circuit court agreed with this contention, and held that the *Commission* should consider these items in arriving at its result. It is argued in support of this view that the service pipe from the main to the corporation cock is unquestionably a part of the company's plant; that in reproducing that plant it would be necessary to excavate and fill new trenches, and to cut through and relay the pavements, and hence if cost of reproduction is to be used as a basis, or even as a material factor, in determining present value, it should include the cost of reproducing the whole plant. We think it is true that the part of the service pipe above mentioned is part of the plant, whether paid for by the company or by the consumer. In the absence of legislative provision to the contrary it would not seem reasonable or feasible to make the division between the company's property and the consumer's property at any point short of the corporation cock at the curb. This, however, does not seem to us decisive upon this question.

Cost of reproduction must mean the cost which will be necessarily incurred by a reasonably prudent and careful man, using ordinarily careful business methods, in reproducing

a plant. of equal efficiency. Anything which under such a conduct of the business would cost nothing to reproduce cannot logically be included. It is not denied that if the city or a new water company were to establish a new plant the consumers could be required, as a condition of receiving water service, to do the work in question, and even furnish the pipe. Such a requirement is quite generally enforced at the present time in cities of this class. Conditions of life at the present time in such cities practically compel residents to accept water service. Even in small cities the old-fashioned well is either tabooed by public opinion or its use prohibited by health regulations. So it seems that that there would be no question but that it would be entirely practicable, and in fact the only reasonably prudent policy, for a new company to require consumers to lay their own service pipes.

This is not the case where land or other property of value has been voluntarily donated to the old company. With regard to such property it has been held in cases involving the fixing of rates that it is rightfully to be considered in arriving at the cost of reproduction. This result is reached on the idea that a new company could not count on receiving such gifts. Whether the logic of these cases be correct or not we do not decide, but in any event the principle does not apply to expenses which may legally be assessed, and in the exercise of good business judgment ought to be assessed, against the consumer. For purchase purposes at least the only expenses which should be considered in the estimate of the cost of reproduction are those which are reasonably necessary in a prudently conducted reproduction. Whitten, Val. Pub. Serv. Corp. §§ 180–192; *San Diego W. Co. v. San Diego,* 118 Cal. 556, 50 Pac. 633.

6. As to the question of the going value. The circuit judge held that the *Commission* fixed the going value of the plaintiff's plant and business at $13,000, and that he was not fully satisfied that in making this determination the *Commis-*

*sion* proceeded on a false theory, or applied an unsound rule, or that its conclusion was unlawful; hence, upon this subject, the court declined to make any alteration or amendment in the order of the *Commission*. This finding is attacked by the plaintiff as unsupported by the evidence, and the claim is that the evidence in the case does not justify a finding that the *Commission* allowed more than $5,000 for the going value. It is also claimed that the *Commission* should have allowed a much larger sum than either of the sums named as the going value of the concern.

At the threshold of these contentions a question of evidence is presented, which will be first considered. The report of the *Commission* contains the tables made by the engineers showing the estimated cost of a reproduction of the plant at present prices and enumerating the items of property and expense which were included in the total estimate. In these tables the actual cost of such reproduction was placed at $282,000, and the estimated present value, after making the proper allowance for depreciation, at $242,217. The item of excavating for service pipes and relaying pavements over such pipes does not appear in the tables, and clearly was not considered by the engineers. The report of the *Commission*, however, contains no explicit statement showing that the *Commission* approved or adopted the estimate of the engineers in its entirety, nor does it expressly enumerate the items which were included by the *Commission* in estimating the cost of reproduction or present value, although it appears that the cost of reproduction was considered by the *Commission* as having a very important bearing on the final result.

In view of the absence of findings showing just what part of the $255,000 compensation was allowed for the physical property and what part for going value, the plaintiff called the commissioners as witnesses, and examined them fully as to their education and experience in matters of this kind; whether they based their conclusions upon the evidence pre-

142    SUPREME COURT OF WISCONSIN.    [MAY

Appleton Water Works Co. v. Railroad Commission, 154 Wis. 121.

sented or relied in part on their own judgment; whether there were any reports of engineers or other agents of the *Commission* other than those embodied in their report which the *Commission* considered in reaching their conclusion; whether they reached the same by applying the same rules of law as would be applicable in a condemnation proceeding; what the difference was between the methods and principles observed by the *Commission* in fixing valuations for rate-making purposes and in fixing the same for the purpose of purchase of the property by a municipality; whether the cost of reproduction of the physical property was considered by the *Commission* as one of the most important evidentiary facts in fixing the compensation in a purchase case; whether the *Commission* had before it and considered evidence of the original cost of the works, and, if so, whether they considered that cost of little or much weight, and why all reference to it was omitted from the decision; whether the *Commission* included in the estimated cost of reproduction any allowance for cutting through and relaying pavements except where such expense had been actually incurred by the company; whether they included anything in the compensation for going value, and, if so, how much; what the principles were upon which the *Commission* determined going value in cases of this kind; whether the *Commission* regarded six per cent. as a reasonable return upon the investment in property of this kind; whether the *Commission* modified the report of the engineers as to the cost of reproduction, and, if so, in what items; whether anything was allowed for the value of the franchise; whether the *Commission* understood the law to be that the full money value of the property must be paid; whether the fact that the public had a hostile feeling towards the company because of defective service which it had rendered was taken into consideration in determining going value; and whether the alleged inefficiency in the fire service and alleged impur-

ity in the water supply were considered in arriving at the go-
ing value.

All of this evidence was seasonably objected to, and thus
the question of the propriety of its admission is fairly pre-
sented, and becomes an important one, especially in view of
the fact that the ruling will doubtless serve as a precedent for
future action in cases of this nature.

The rule that testimony of arbitrators as to what transpired
at the hearing and during their deliberations will not be re-
ceived to impeach their award is quite well settled, and was
stated and approved by this court in the *Eau Claire Case,* 137
Wis. 517, 119 N. W. 555, where the question arose concern-
ing the award of a board of arbitration appointed to assess
the value of a similar plant which the city of Eau Claire was
taking over under the terms of a contract which provided for
the fixing of the compensation by a board of arbitrators. No
reason appears why that rule should not apply in full force
to the *Railroad Commission.* It is a rule founded on good
sense and public expediency, and is simply an application of
the same principle which has been universally applied to the
verdicts of juries. The idea is that there should be no possi-
bility of the overturning of a judgment or final determination
of a controversy which has been reached after fair trial and
hearing by reason of the fact that one of the body which ren-
dered the judgment at some later period, either honestly or
dishonestly, or from mere failure of memory, impeaches the
result by testifying to some defect in the mental operations of
himself or his fellows, or to a mistaken view of the legal prin-
ciples applicable to the case. Important decisions of this
kind cannot be upset or discredited in this manner if they
are to be of any value. They are not subject to any such haz-
ard. But it is equally well settled that where the record is
silent on the subject an arbitrator may be sworn to show what
issues he considered, and what matters of fact were actually

submitted and passed upon by the arbitrators, and sometimes to show that he acted under a mistake of fact as to the scope of the issues submitted to him.    4 Wigmore, Ev. § 2358.

In the present case it appears clearly from the report of the *Commission* that the cost of reproduction was considered one of the prime factors in reaching the ultimate result, and it does not certainly appear (although the inference is persuasive) that the *Commission* adopted the report of the engineers as to the cost of present reproduction, and thus excluded from their consideration the question of the cost of paving over service pipes and trenching for the same.

We think it was competent to establish this fact by the evidence of the arbitrators, because it did not appear from the report and was not a question as to their mental processes, but simply whether a given fact was before them.    Had the *Commission* stated the fact in their report there would have been neither occasion nor excuse for the resort to parol evidence. Under the principles just stated, we are unable to see the propriety of the examination of the commissioners upon any other question in this case.    The report shows affirmatively that nothing was allowed for the value of the indeterminate permit or franchise, that the cost of paving over mains was included in the estimate of the cost of reproduction, and that the going value was considered as an essential element to be allowed for in reaching the final result, and so it became unnecessary and improper to inquire as to either of these facts. The compensation plainly could not properly be reached by adding together items of cost or values of specific items of property, physical or incorporeal, nor was it so reached by the *Commission,* but rather by a comprehensive view of all the proper elements of value taken as a whole, and determining as accurately as possible the revenue-producing power of the entirety upon the basis of reasonable charges for service to the consumers.    The mental processes by which this final

result is reached by a commissioner and the relative import-
ance given by the mind to each element, as well as the legal
or economic principles deemed by him to have a bearing on
the result, are not subjects upon which the commissioners can
properly be examined. Had the report of the *Commission*
stated all of the items of property and expense which they
considered as entering into the cost of reproducing the plant,
we think it clear that none of the parol evidence given by the
commissioners would have been admissible. So far as the
present case is concerned, we think the only evidence of this
character properly received was the evidence showing that
the cost of paving and trenching for service pipes was ex-
cluded from the estimated cost of reproduction. Substan-
tially all of the other evidence obtained from the commis-
sioners related either to facts fully covered by the report or
to the methods of procedure adopted by the commissioners,
the legal or business principles upon which they acted, or the
operations of their minds in reaching their conclusions. We
have discussed this question of evidence at some length be-
cause of the importance of having a definite and correct rule
upon the subject in future cases rather than because of its in-
trinsic importance in this case. As matter of fact the testi-
mony of the commissioners threw very little additional light
on the case. The conclusion reached by the circuit judge to
the effect that the *Commission* determined the going value of
the concern to be $13,000 seems to be based almost wholly
on the fact that in the engineers' estimate of the physical
value of the plant embodied in the report the present value
was fixed at about $242,000, while the *Commission* fixed the
amount of the just compensation at $255,000. The com-
missioners who were placed on the stand were unable them-
selves to name any definite sum which they were willing to
say they considered in their minds as the "going value," al-
though both testified in corroboration of the report that "go-

ing value" was considered and allowed for in arriving at the final result. The fact that the testimony of the commissioners was taken a year and a quarter after the order was made may serve to explain why the commissioners could not testify with certainty as to their mental processes, and may also serve as an additional reason why the reception of such vague recollections as testimony ought not to be allowed.

The term "going value" is somewhat vague, and is a comparatively recent addition to the terminology of the subject. It is not the value of the franchise and it is not the good will of the business,—certainly it cannot be the latter in the case of a monopoly like the present. It has been variously spoken of as the "difference between a dead plant and a live one" (*Omaha v. Omaha W. Co.* 218 U. S. 180, 30 Sup. Ct. 615), or "the element of value which comes from the fact that the property is sold as a going concern" (*Gloucester W. S. Co. v. Gloucester,* 179 Mass. 365, 60 N. E. 977),—"the added value because of the company's being a going concern" (Commissioner Roemer in his testimony in the present case).

The existence of the term as designating a substantial element of value seems to be largely due to the fact that in appraisal cases like the present as well as in rate-making cases there has been a very general adoption, both by courts and commissioners, of the plan of ascertaining by expert evidence the cost of reproduction of the existing plant, and then making a deduction for depreciation, and thus arriving at what is called the present physical valuation. This has been universally recognized not as fixing the present physical value of the property or the business, but only as an important and helpful consideration which may throw much light on the question. It has the advantage of comparative ease and certainty of ascertainment. It is said by Whitten (Val. Pub. Serv. Corp. § 639) to be at present the most generally accepted basis of valuation for purchase or rate-making. Construing the word "basis" to mean simply a fundamental fact

or starting point not in any sense exclusive or controlling, the statement seems to be substantially correct.   Important as it may be, however, this physical valuation so obtained is but one of numerous facts to be considered in reaching the final result.   The commercial value of the business in full operation and entitled to charge reasonable rates for its service must, however, be considered as approximating the compensation which should be allowed for the property,—in other words, the sum which the business should be capitalized for in order that the owner should receive a reasonable return on the investment when the business is conducted with reasonable business skill and charges such reasonable rates for service as the law permits.   If this value exceeds the physical value of the tangible property, then it might be said that the difference ought to be the measure of the indefinite and intangible thing called going value, and such has been sometimes considered the best way to arrive at the going value. Again, it has been thought that going value might be measured by ascertaining as nearly as possible the cost of reproducing the existing business, sometimes called the unrequited outlay, $i.$ $e.$ the amount of the deficits which would be incurred added to the promotion expenses necessary to be incurred up to the time the new plant would have a business equal to that of the present plant; or again, by ascertaining the actual unrequited outlay in building up the present business; or again, by ascertaining the average time and proportional outlay actually incurred in building up the business of a number of concerns of like character, and thus establishing what may be called a curve which can be used in determining the time and outlay which would be reasonably necessary in the instant case.   It is quite apparent that the result reached by either of the suggested methods could hardly be considered as anything more than suggestive, and that its persuasiveness would necessarily depend upon many other facts which must enter into the general problem of value.   The actual original

cost of establishing the business of the existing plant is very clearly unsatisfactory to the last degree as a test of going value, because it may have been wasteful and extravagant, and because also it is well known that the building up of the business of a water plant thirty years ago, before sewerage systems had become common and the private water supply had been discredited, was a much slower process than at the present time, when in such a city as Appleton the population has been educated to use the public supply of water. Estimates of cost of working up a business under present conditions approach nearer to the requirements of a test, but they must always remain estimates, however carefully they be conducted; they cannot be called facts.

However, the fundamental difficulty with the attempt to set a definite sum as the measure of going value is that it is an attempt to divide a thing which is in its nature practically indivisible. The value of the plant and business is an indivisible gross amount. It is not obtained by adding up a number of separate items, but by taking a comprehensive view of each and all of the elements of property, tangible and intangible, including property rights, and considering them all not as separate things, but as inseparable parts of one harmonious entity, and exercising the judgment as to the value of that entity. In this way the going value goes into the final result, but it would be difficult for even an expert to say how many dollars of the result represent it.

In the case before us it is quite apparent from the report of the *Commission* that the commissioners fully appreciated this cardinal principle of valuation.

They had before them much evidence bearing on the general question of value and just compensation from different angles; they had the very careful and elaborate estimates of their engineers, not only as to the cost of the reproduction of the plant and its present value based on present prices,

but also based on the average of prices for five years; they had all the testimony given in the rate case showing inadequacy in the present plant to meet the reasonable demands of the public service, and the necessity of the immediate expenditure of at least $50,000 to make the plant reasonably efficient; they had tabulated statements furnished by the company itself in the rate case which tended strongly to show that the revenues of the plant had not been sufficient at any time to give anything more than an insignificant return upon the investment, if indeed they had given that; they had very complete information as to the condition of the physical property, the attitude of the public toward the concern, the probable growth of the city, and in fact of all the surroundings; they had also expert evidence as to the actual unrequited cost of building up the business of the plant, and expert evidence on both sides as to the probable unrequited cost in building up the same business with a new plant under present conditions, which estimates differed by many thousands of dollars. All of this testimony was considered by the *Commission* in passing upon the ultimate question of value. It seems very clear to us from the report of the *Commission* that all the facts in evidence bearing on the question of value were carefully weighed by the *Commission*. We discover nothing to indicate that the *Commission* acted on any mistaken basis in reaching the conclusion that $255,000 was the fair and just compensation which should be paid for the plant.

Those parts of the judgment adjudging that the order of the *Railroad Commission* should be altered by providing therein for the payment by the city to the plaintiff of (1) the costs and disbursements of this action, (2) the value of the indeterminate permit, (3) the cost of cutting through and relaying pavement over service pipes, (4) the cost of excavating and filling trenches for service pipes, (5) interest on the

three last named sums from December 1, 1911, to the date of payment; and directing the said *Commission* to alter and amend its order of December 7, 1910, in the particulars named, must be reversed; and that part of the judgment providing that said report be altered and amended by requiring the city to pay to the plaintiff interest on $255,000 from December 1, 1911, to February 7, 1912, amounting to the sum of $2,805, with interest on said latter sum to the date of payment, must be affirmed.

*By the Court.*—Judgment affirmed in part and reversed in part, as indicated in the last paragraph of the opinion, and action remanded to the circuit court with directions to remand the order in question to the *Commission* for such alteration as shall make it conform to this opinion. No costs are to be taxed except the fees of the clerk of this court, which shall be taxed and paid by the plaintiff.

The following opinion was filed June 10, 1913:

MARSHALL, J. I have misgivings as to some features of this case, and will state briefly the reasons thereof. I assume that in an apprisal of public property, whether for taxation, rate-making, or public purchase, the value should be fixed at what the utility is fairly worth as an entirety,—the physicals as characterized by the intangibles.

At first, largely because of the assumed knowledge of so-called experts, the idea of physical value was developed, as if there were no value to be considered except that of tangible things. It was the result, in my judgment, of inclination to lay hold of such characterizing features as good will, using the term in a broad sense, and the public privilege without rendering therefor the constitutional equivalent. Public functionaries, including judges, drifted largely with the current, though generally making a record of such shadowy character as to render uncertain whether the unconstitutional

scheme had been adopted or not. That led to much litigation and dissatisfaction.

In the *Railroad Case* (*Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 108 N. W. 557), the physical valuation idea met that of valuing the utility as an entirety,—the physicals vitalized by the franchise and condition of maturity,—and the latter prevailed. The court remarked respecting the procedure of the appraisal:

"They knew the law and their duty. They had a wide discretion in respect to the mere elements to be considered in making the valuation. If they thought the so-called valuation of physical property would aid them, they were permitted to procure evidence of that sort. We find, however, no satisfactory indication that they arrived at the value of the railroad property by adding together valuations of physical things and the value of the franchise or that they did anything other than just what they were required to do by the statute: determine the value of the railroad property. . . . That included the visible things and the franchise, not as separate things any more than the horse's blood, frame, internal machinery and other elements, are separate things,—all taken together constitute the horse; remove any one of the things essential to life and motion, and all conception of the animated thing, the horse, disappears."

As I read the result here it does not contain any very satisfactory indication that the rule thus plainly announced was followed below. I am pretty strongly persuaded that the privilege and the established business condition were not considered to any appreciable degree. That creates serious doubt as to whether injustice has not been done. True, it is our duty to resolve all fair doubts in favor of the *Commission* appraisal. But it is only by going to the limit in appreciation of that duty that I can concur in the affirmance of the judgment appealed from. I trust that in future appraisals it will be made plain that the constitutional rights of property owners have not been unduly infringed upon. Courage on the part of apprisers to do what duty requires and do it so as to leave

no doubt about the matter in the minds of parties or others is the best.

The suggestions here made as regards the proper manner of viewing a public utility in apprising it has the support of many courts, as the following citations will indicate: *Matter of Brooklyn,* 73 Hun, 499, 26 N. Y. Supp. 198, affirmed 143 N. Y. 596, 38 N. E. 983, affirmed 166 U. S. 685, 17 Sup. Ct. 718; *Bristol v. Bristol & W. Water Works,* 23 R. I. 274, 49 Atl. 974; *Norwich G. & E. Co. v. Norwich,* 76 Conn. 565, 57 Atl. 746; *Kennebec W. Dist. v. Waterville,* 97 Me. 185, 54 Atl. 6; *Cotting v. Kansas City S. Y. Co.* 82 Fed. 850; *Brunswick & T. W. Dist. v. Maine W. Co.* 99 Me. 371, 59 Atl. 537; *Montgomery Co. v. Schuylkill B. Co.* 110 Pa. St. 54; *Clarion T. & B. Co. v. Clarion Co.* 172 Pa. St. 243, 33 Atl. 580; *West Chester & W. P. R. Co. v. County of Chester,* 182 Pa. St. 40, 37 Atl. 905.

Why should the public privilege without which the investment in a public utility property would not be made be left out of consideration in fixing a value upon the entirety in operation? Such a privilege, in general, costs money legitimately expended; besides it is a right owned by the grantee and none the less so because it was conferred without other consideration than the agreement to use it for the purposes of the grant. Such a franchise, in general, comes into existence and later reaches the corporation by purchase. In this case, long after acquirement in that way, the franchise was exchanged for the indeterminate permit by a bargain with the state. There was, in contemplation of law, a meeting of minds resulting in such exchange upon the basis of agreed equivalents. The property thereafter was characterized by the indeterminate permit as it was before by the old privilege. The new franchise, the same as the old one, is not a thing of value, strictly speaking, that is, regarded as a separate and distinct thing, but to the extent that it gives character to the

tangible things and affords opportunity to carry on a public
utility business it is of much value.   No one could value the
visible things uncharacterized by the privilege without doing
great injustice to the proprietor.   Why not confess it and,
while shaping administration in recognition of it, be so open
and frank and plain in respect to the matter as to leave no un-
certainty about it to vex parties or courts?

In the *Railroad Case* (*Chicago & N. W. R. Co. v. State,*
128 Wis. 553, 108 N. W. 557) it was held that mere cost of
construction less depreciation, is of consequence in valuing a
public utility only as evidence bearing on the ultimate ques-
tion to be solved.   It was there conceded by the commission-
ers that in arriving at the value of the utility the privilege
feature was considered; but only as a characterizing condition
of the visible thing.   The claim was made that in valuing
other corporate property by local assessors the public privi-
lege and going value were not considered and so the commis-
sioners violated the rule of equality.   Though assessors testi-
fied that they commonly valued corporate property only con-
templating the visible things the court said:

"The value of the physical element of corporation or busi-
ness property, is made up largely of those which are invisible.
In valuing such property, looking only at the visible elements,
one would unconsciously include the invisible.   No one would
think, in valuing a factory of any sort with an established
business, of its value as a disorganized piece of property.   In
apprising it in its former condition at what it would be
thought worth in money, and without specially taking into
consideration the elements giving thereto, perhaps, its chief
value, such elements would be included. . . .   To our minds,
when the witnesses on the trial of this case said they valued
the property . . . observing only the things visible, fixing
the value upon those things as they found them, whether they
specially thought of the other element and considered the
same or not, they were, in effect, included.   In assessing the
property of a corporation no attempt should be made to sep-

arate tangible from intangible elements.    The assessment of the one should be included in that of the other by assessing the whole at what it is worth under the circumstances."

Thus it will be seen that in valuing a public utility property all the intangible elements are to be, indirectly at least, considered.    The privilege feature and the circumstance of activity promoted by years of building up are the very breath of life of the utility.    Without them there is a lifeless, useless body.    With them, there is a living thing, so to speak.

After the early decision the old term and idea of "physical value" were largely displaced by that of "cost of reproduction," such cost having close resemblance to mere physical valuation, and resort was had, as before, largely, to so-called experts for evidence.    Why treat the question of value of such property as scientific and technical?    What was said by Lord Campbell in *Tracy Peerage,* 10 Clark & F. 154, 191, and adopted by this court in *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 331, 80 N. W. 644, is appropriate: "Skilled witnesses come with such prejudice on their minds that hardly any weight should be given to their evidence."

Triers of fact, in applying the cost of reproduction theory, easily realize that it could not be confined to mere physical valuation, either of the elements of a utility or the visibles considered as a unit,—that it had to be extended to the characterizing circumstances,—the privilege and the advantages of maturity.    Good will, by name, putting a narrow construction on the term, was rejected; but as an equivalent the going-value feature was adopted.    The experts had their innings in working out the matter by the rule of theory.    The turning of a simple mathematical business problem into a scientific question could but naturally result, as it did here, in the going-value feature being put at anywhere from five to around thirty per cent. of the valuation of the physical thing—the result being mere guesswork and within a very wide range.

From a business standpoint it seems that the going value of a public utility property is not so technical as to be a proper subject for opinion evidence, and that resorting to it and making diagrams with theoretical lines for the purposes of creating proof, tends to misinform and confuse instead of enlighten. Under normal conditions, the question of the going value of a concern is susceptible of pretty close mathematical solution. To illustrate: Assume that plaintiff, city of Appleton, afforded an average opportunity for a water works enterprise, that the business of developing the property there was handled with ordinary care and started with an investment which ought to be ascertainable with reasonable accuracy, and apply common experience thereto, that it takes five to ten years before the gross income in such circumstances will balance a fair rate of interest upon the investment, operating expenses, repairs, and depreciation. The deficit for the first year would, necessarily, with reasonable interest be required to be carried over to the next year. The deficit at the end of that period would, necessarily, be required to be added to the previous one and with interest thereon carried to the next year, and so on from year to year; the deficiency, under normal conditions, decreasing each year until, finally, the current income would be sufficient to balance the current liabilities. In the now state of equilibrium, the deficiency account would measure the value of the mature going business feature. In case of there being anything abnormal by way of bad management that would need to be taken into consideration as an evidentiary matter.

The difficulty created by trying to distinguish between going value and good will might well be avoided. Why indulge in a technical difference, which, from a broad standpoint, is a mere play on words? In a broad sense, good will is, after all, the value which attends and characterizes a business as a going industry and has developed and become attached

thereto in the course of time.    Why discard an element of property under one name which must be taken back into another as matter of justice and of constitutional right?    There is, in my judgment, no logical distinction between going value in connection with a public utility, and good will of a bank as it was considered in *Lindemann v. Rusk,* 125 Wis. 210, 104 N. W. 119, and there held to be worth around twenty-five per cent. as much as the original money investment in the bank. Why not call things by their right names from an original standpoint, instead of trying to invent new ones to meet illogical objections—objections which if acted upon would lead to unconstitutional results?

If what I have said shall tend to move apprisers of public utility property to work along a practical business line the same as one would in apprising any other thing, as suggested in the *Railroad Company Case,* and the making of the record in each case accordingly, much litigation will be prevented growing out of conviction or uncertainty as regards whether constitutional rights to just compensation in case of property being taken as in this case, have not been violated.    I am fearful that the right of the water company here has not been fairly considered in respect to the elements of indeterminate permit and good will, or going value, whichever one may choose to call it.