DULUTH STREET RAILWAY COMPANY, Appellant, vs. RAIL-
ROAD COMMISSION, Respondent.

*May 4—October 5, 1915.*

*Street railways: Regulation of rates: Paramount right of state: Ordi-
nance contracts: Validation by legislature: Statute construed:
Railroad commission: Fixing reasonable rates: Valuation of
property: Evidence: Findings: Review in circuit court: Trial de
novo: Appeal: Decision, when disturbed: Reasonable return
from investment. Discriminating rates: Tickets at reduced rate:
Elements of value to be considered: Earning power: Valuation
for taxation not conclusive: Going value: Franchise value: In-
vestment in amusement park: Unimportant omissions: Repro-
duction cost: Engineering cost: Interest and contingencies: Co-
ordination· of plant: Original cost: Undervaluations: Easement
in streets: Validity of grant: Economies in operation: Method of
arriving at values.*

1. A municipal ordinance, enacted under the authority of sec. 1862,
   Stats., and its acceptance by a street railway company, even if·

they constituted a valid contract empowering the company to charge a five-cent fare, did not abrogate the right of the legislature, acting directly or through the railroad commission, to regulate the rates. The contract in such a case remains valid only until the state sees fit to exercise its paramount power of regulation.

2. Sec. 247, ch. 124, Laws 1891, repealing the original charter of the city of Superior (ch. 152, Laws 1889), but providing that nothing in the repealing act "shall be held to impair any of the rights granted by said city" to the street railway company, that the ordinance granting the same is "ratified, confirmed and validated," and that ordinances not repealed were to continue and remain in force "until altered, amended, repealed or suspended by the common council in pursuance of this act," did not make the ordinance granting rights to the street railway company a law of the state, nor constitute a contract between the state and the company fixing the rate of fare to be charged by the company during the term of its franchise. It merely preserved existing rights granted by the city and cured any defect that might exist in the manner of granting the franchise.

3. An inventory of the property of a street railway system, made for the owner at the time such owner purchased the system, together with a subsequent cost appraisal by engineers of the railroad commission,—all constituting one of the files in the office of the commission at the time of the hearing,—although not formally offered in evidence, was properly considered by the commission in valuing the street railway property for the purpose of fixing rates.

4. Even if the railroad commission considered improper evidence in fixing rates to be charged by a street railway company, that fact would not be ground for reversal of the judgment of the circuit court based upon a trial *de novo* under sec. 1797—16, Stats. *International H. Co. v. Industrial Commission*, 157 Wis. 167, distinguished.

5. Under sec. 1797—14, Stats., the railroad commission has no power to change rates unless they are found to be unreasonable or discriminatory; but where the commission found that the rates charged by a street railway company were "somewhat higher than they should be," and proceeded to fix a considerably lower rate, which it held to be reasonable and adequate, this was in substance a finding that the former rate was unreasonable.

6. In ascertaining whether rates of fare charged by a street railway company are reasonable or otherwise, net earning power is one of the most important elements to be considered. Where rates are so adjusted as to yield a fair return on the value of the prop-

erty over and above expenses and depreciation they are reasonable; where they are so fixed as to materially exceed this sum, they are not.

7. A decision of the railroad commission as to what is a reasonable rate, if approved by the trial court, will not be disturbed by this court on appeal unless it is clearly wrong.

8. A decision of the railroad commission in this case that, under all the circumstances, a return of seven and one-half per cent. per annum on the reasonable value of the street railway property in the city of Superior would be fair and adequate, and that the rates of fare should be adjusted accordingly, is sustained.

9. An order of the railroad commission requiring a street railway company to sell six tickets for twenty-five cents is not void on the ground that it unjustly discriminates against those who wish to purchase only a single ride.

10. A valuation of street railway property for taxation purposes (which may be larger because an excessive amount is being earned) is not conclusive as to its value for rate-making purposes; but it may well be that after the state has fixed a value for the latter purpose and restricted the earning power of the road to a reasonable return on such value, it should not fix a materially higher value for purposes of taxation.

11. When the value of the property of a street railway company, operating under an indeterminate permit and entitled to charge only reasonable rates, is fixed on the theory that the business is a going one and that the owner will be permitted to carry it on in the future unless the municipality elects to buy it for full and fair value, all proper allowance is thereby made for franchise value.

[12. Whether, in valuing for rate-making purposes the property of a street railway in Superior operated by the same company that operated the street railway in Duluth, a *pro rata* share of the company's investment in an amusement park in Duluth should have been taken into account, is not determined.]

13. Failure to take into account items aggregating only $4,476 was not a substantial error affecting a decision by which, for rate-making purposes, the property of a street railway company was valued at $700,000.

14. An allowance by the railroad commission, in valuing street railway property for rate-making purposes, of only twelve per cent. of the reproduction cost, to cover cost of engineering, interest on money during construction, mistakes, and unforeseen contingencies, having support in the evidence and having been approved by the trial court, is sustained on appeal.

15. Where the railroad commission determined what it would cost to

reproduce a street railway plant in the condition it was at the time of the hearing, this necessarily included the cost and value of co-ordinating the plant into a harmonious entity.

16. Where, in a proceeding to fix the rates of fare to be charged by a street railway company, an attempt was made to ascertain the original cost of the property and also what it was worth after making deductions for depreciation, certain alleged omissions and undervaluations were unimportant, it appearing that they had no substantial effect on the final determination by the railroad commission, which was more largely based upon the reproduction cost less depreciation, with an allowance for going value, and there being no claim that in ascertaining such reproduction cost any items of property were omitted.

17. Although, before the recording of a city plat, an easement and right of way for street railway purposes in streets designated thereon was conveyed by the owner of the land to a street railway company, such company could not lay its tracks or operate its cars except in pursuance of a franchise granted by the city; and the railroad commission properly allowed nothing on account of such easement in valuing the property of the company for rate-making purposes, in the absence of any evidence as to what the value of such easement would be in case the company should in the future be authorized to carry freight or to run interurban cars and abutting owners should claim damages on the ground that an additional servitude was thereby imposed upon their property.

18. Such grant of an easement in the streets having presumably been made to insure to the grantee the exclusive right to build a street railway in the city, its validity may well be doubted.

19. The failure to take into account, in fixing the rates of fare to be charged for street railway service in Superior, alleged economies in operation by reason of the street railway lines in Superior and Duluth being under one management and control and supplied with power from a single plant, is *held* to have been justified by the evidence, which tended to show that the amount so saved was so small as to be negligible.

20. In fixing a value for rate-making purposes the railroad commission correctly considered the cost of reproduction, the fact that the street railway company was a going concern having an established business, the fact that it would have the right to continue to carry on the business in the future, and, to some slight extent, the original cost of the property less depreciation, treated them as inseparable parts of one harmonious entity, and fixed a value on the property as an entirety, giving due importance to reproduction cost. No erroneous elements were included in fixing a value as indicated and no essential elements were excluded.

MARSHALL, J., dissents.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

The Commercial Club of the city of Superior filed a complaint with the *Railroad Commission of Wisconsin,* setting forth that the rate of fare charged by the *Duluth Street Railway Company* for carrying passengers on its street cars in the city of Superior was excessive, and praying that an investigation be made and the rate of charge reduced. Issue was joined on this petition and a hearing had before the *Railroad Commission* on January 16, 1912, and continued from time to time until completed. At the time the petition was filed a charge of five cents was made for carrying each person, except children under five years of age, the payment of which sum entitled a person to one continuous ride with the privilege of a universal transfer. After the hearing was had, the *Railroad Commission,* on November 13, 1912, ordered the plaintiff in this action to sell, through its conductors, six tickets for twenty-five cents, good on all lines at all hours, and subject to existing transfer privileges. The plaintiff brought an action in the circuit court for Dane county to set aside this order. The circuit court found the value of the plaintiff's property used and useful in conducting its business as a common carrier was reasonably worth the sum of $700,000 on June 30, 1911, and that the order of the *Railroad Commission* requiring the sale of six tickets for twenty-five cents was neither unlawful nor unreasonable. As a conclusion of law the court found that the defendant was entitled to judgment dismissing the complaint, and from a judgment accordingly entered this appeal is taken.

The facts necessary to an understanding of the issues raised on the appeal are numerous, and those deemed essential will be stated in the opinion in connection with the discussion of the different issues presented.

For the appellant there was a brief by *W. R. Foley* and *Miller, Mack & Fairchild,* and oral argument by *Mr. E. S. Mack* and *Mr. Foley.*

For the respondent there was a brief by the *Attorney General* and *Louis Hanitch,* and oral argument by *Mr. Hanitch* and *Mr. Walter Drew,* deputy attorney general.

The following opinion was filed June 1, 1915:

BARNES, J.    The original street railway line in what is now the city of Superior was constructed by the Douglas County Street Railway Company, operating under a franchise granted by the town of Superior before the city was incorporated.    Among other things, this franchise authorized the street railway company to charge a five-cent fare between certain designated points, and a ten-cent fare between the Superior and West Superior termini of its road.

In 1889 the city of Superior was incorporated by special act of the legislature.    On July 9, 1889, the city granted a franchise to the street railway company to run for a term of thirty years.    Sec. 7 of such franchise was as follows:

"The said company may regulate and establish, from time to time, such rates of fare for the transportation of passengers or freight over its lines of railway, as it may deem proper; provided that the charge for carrying a person, including hand baggage, from one point to another, within the city limits, shall not exceed five (5) cents for a distance of two miles or less, nor five (5) cents over any continuous line operated as such."

Sec. 17 of the ordinance provided that within thirty days after its publication the street railway company might file its acceptance thereof with the city clerk and the relinquishment of all rights and privileges acquired under the franchise granted by the town of Superior, and that from and after the filing of such acceptance the ordinance should have the effect of and be a contract between the city of Superior and the street railway company, which should be the measure of the rights and liabilities of said city as well as of said company. This ordinance was accepted by the street railway company.

Ch. 124 of the Laws of 1891 was entitled "An act to re-

vise, consolidate and amend chapter 152 of the Laws of 1889, entitled 'An act to incorporate the city of Superior.'" As a matter of fact, sec. 247 of ch. 124 of the Laws of 1891 repealed ch. 152, Laws of 1889. This section provided that the repeal should

"not in any manner affect, injure or invalidate any existing contract, act or suit, claims, penalties or demands, that may have been entered into, performed or commenced by the village of Superior (and the word 'village' herein shall be construed to mean city), or that may exist under or by virtue or in pursuance of the said act incorporating said city, or of the acts and parts of acts amendatory thereof, or of any of them, but the same shall exist and be enforced and carried out and be completed as fully and effectually to all intents and purposes as if this act had not been passed, and nothing herein contained shall be held to impair any of the rights granted by said city of Superior to the Douglas County Street Railway Company, and the ordinance granting the same is hereby ratified, confirmed and validated, and all other ordinances, resolutions, regulations, rules, by-laws and orders either of the village of Superior or the city of Superior, or parts thereof not repealed, suspended, nor made void by this act, or by ch. 152 of the Laws of 1889, shall continue and remain of the same force and effect as if this act had not been passed, until altered, amended, repealed or suspended by the common council in pursuance of this act."

In 1892 the Douglas County Street Railway Company transferred its property, including its franchises, to the Superior Rapid Transit Company. The latter company went into the hands of receivers in 1896, and the receivers operated the property until 1900, when it was sold on foreclosure and acquired by the *Duluth Street Railway Company,* the present plaintiff. This latter company had been engaged in operating a street railway system in Duluth, and it was placed in the hands of a receiver in 1898. The purchase at the foreclosure sale of 1900 was part of a reorganization affecting both properties, and in fact brought them under a single ownership.

The order made by the *Railroad Commission,* among other things, required that "the *Duluth Street Railway Company,* in addition to its present rates of fare, shall sell, through its conductors, six tickets for twenty-five cents, such tickets to be good for use at all hours of operation over any line, and subject to the existing transfer privileges."

The *Railroad Commission* placed a valuation of $700,000 on the property of the plaintiff in Wisconsin and some property in Duluth used in connection with the operation of the street-car system in Wisconsin.

The plaintiff makes four main contentions: First, that the action of the *Railroad Commission* is void because its order violates the obligation of a contract, contrary to the state and federal constitutions. Second, that its order is void because the *Commission* took a mistaken view of the law, and of its powers, in a number of important particulars. Third, that in any event the rates charged were reasonable, and the *Commission* had no power or jurisdiction to change such rates. Fourth, that the *Railroad Commission* made a gross undervaluation of its property.

Very many questions are argued in the able and exhaustive brief filed by the appellant, but they all bear either directly or indirectly on the propositions above set forth.

Sec. 10 of art. I of the constitution of the United States, and sec. 12 of art. I of the constitution of the state of Wisconsin, each prohibits the passage of any law by the state impairing the obligation of contracts.

*Rights conferred by the ordinance of 1889.*

The ordinance of 1889 recites that it is to constitute a contract if accepted. The street railway company, in consideration of the privileges granted, relinquished certain rights which it had under its existing franchise. The ordinance and its acceptance constituted a contract protected by both constitutions, provided the city had power to make such a contract, unless the ordinance was subject to amendment or

repeal under the reserve power contained in sec. 1 of art. XI of our constitution.

Counsel for respondent contend that the ordinance provided for a maximum rate which could not be exceeded, and was not a contract empowering plaintiff to exact a five-cent fare at discretion. The parties agreed that the plaintiff might establish such rates of fare "as it may deem proper," provided that the charge for carrying a person from one point to another within the city limits "shall not exceed five cents," etc.

The language used in this franchise is somewhat different from that considered in *Milwaukee E. R. & L. Co. v. Railroad Comm.* 153 Wis. 592, 142 N. W. 491. There a maximum charge was fixed, but it was not affirmatively stated that the railway company might at discretion charge up to the maximum. Whether this case is ruled by the cases of *Detroit v. Detroit City St. R. Co.* 184 U. S. 368, 22 Sup. Ct. 410; *Cleveland v. Cleveland City R. Co.* 194 U. S. 517, 535, 536, 24 Sup. Ct. 756, and *Minneapolis v. Minneapolis St. R. Co.* 215 U. S. 417, 30 Sup. Ct. 118, as contended by the plaintiff, or by *Georgia R. & B. Co. v. Smith,* 128 U. S. 174, 9 Sup. Ct. 47; *Southern Pac. Co. v. Campbell,* 230 U. S. 537, 33 Sup. Ct. 1027, and the *Milwaukee Case,* above referred to, as contended by defendant, we do not find it necessary to decide.

Conceding that the ordinance and its acceptance constituted a contract empowering the appellant to exact a five-cent fare, and conceding that the act of the city in making such a contract was not *ultra vires,* still the general provisions of sec. 1862, under which the city acted, did not abrogate the right of the legislature, acting directly or through the *Railroad Commission,* to exercise the function of regulating rates whenever it was deemed proper to assert it. The contract remained valid until the state saw fit to exercise its paramount authority to regulate such rates. So much has

been decided in *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 28, 129 N. W. 925, and in *Milwaukee E. R. & L. Co. v. Railroad Comm.* 153 Wis. 592, 142 N. W. 491. Counsel cite many authorities to show that these cases were incorrectly decided. Maybe they were. A writ of error to the federal supreme court has been taken from the judgment in the *Milwaukee Case,* but that court has not yet announced its decision in the case. We are not satisfied that the two cases referred to were incorrectly decided by this court, and for the present and until we are better enlightened we adhere to them and rest our present conclusion on the reasons stated in the opinions in these cases.

### *Effect of the law of 1891.*

Appellant insists, however, that there is one very significant distinction between the present case and the two last referred to, arising out of the enactment of ch. 124, Laws 1891, the material part of which has been quoted. It is argued that here the state has ratified and made the ordinance of 1889 a law of the state, and that while it might set at naught contracts fixing rates made by minor political units acting under sec. 1862, it cannot set aside such a contract of its own making.

If the act of 1891 means what counsel think it does, there is plenty of authority to support the conclusion deduced, unless the act is repealable under the reserve power contained in sec. 1 of art. XI of our constitution. *Walla Walla v. Walla Walla W. Co.* 172 U. S. 1, 19 Sup. Ct. 77; *City R. Co. v. Citizens' St. R. Co.* 166 U. S. 557, 563, 564, 567, 568, 17 Sup. Ct. 653; *Detroit v. Detroit City St. R. Co.* 184 U. S. 368, 382, 383, 389, 396, 398, 22 Sup. Ct. 410; *Cleveland v. Cleveland City R. Co.* 194 U. S. 517, 533, 536, 24 Sup. Ct. 756; *Cleveland v. Cleveland E. R. Co.* 201 U. S. 529, 541, 26 Sup. Ct. 513; *Wright v. Milwaukee E. R. & L. Co.* 95 Wis. 29, 69 N. W. 791.

We think, however, that it was not the intention of the act
of 1891 to more than preserve existing rights that might
otherwise be jeopardized by the repeal of the charter of the
city of Superior and to cure any defect that might exist in
the manner of granting its franchise to the plaintiff, and that
it was not intended to confer any right on plaintiff which the
council itself might not have conferred had it proceeded in
the manner provided by law.    The city acted under sec. 1862
in enacting the 1889 ordinance.    It was in all probability
foreign to the legislative thought to single out one street rail-
way company and confer privileges upon it that no other rail-
way company in the state could enjoy under the general law,
assuming that sub. 7 of sec. 31 of art. IV of the constitution
did not prohibit such action.    The language used is not
fairly susceptible of the meaning which counsel give it.    It
was provided that nothing in the repealing act "shall be held
to impair *any of the rights granted by said city of Superior*"
to the railway company, and the ordinance granting the same
is "ratified, confirmed and validated."    It seems pretty clear
that the ordinance was ratified, confirmed, and validated so
as to preserve the *rights granted by the city* and that the
validating act went no further.    The right now claimed was
never granted by the city, for the very good reason that it
never had the power to grant it.    There is another persuasive
reason for adopting this construction of the 1891 law, and
that is found in the final provision contained in sec. 247,
whereby the ordinance of 1889 and other ordinances not re-
pealed were to continue and were to remain in force "until
altered, amended, repealed or suspended by the common
council in pursuance of this act."    It is not to be supposed
that the legislature intended to confer on the city of Su-
perior the power to alter, amend, repeal, or suspend a law en-
acted by the legislature.    It would be a rather startling
proposition to assert that the legislature even had the right to
delegate to the common council of a city the power to amend

or repeal laws passed by it.   We are satisfied that the act of
1891 went no farther than to legalize acts which the city
might have done had it proceeded according to law, and that
there is no substantial difference between the present case and
the former cases concerning the right of the state to regulate
the rate of fare which the plaintiff might charge.

Taking up the further questions involved, in the order in
which they have been presented, it is urged (1) that the order
is void because the *Commission* considered matters which
were not in evidence and which the plaintiff had no oppor-
tunity to meet; (2) that no reduction could be made in the
existing rate unless it was found to be unreasonable, and no
such finding was made; (3) that on the basis of the *Commis-
sion's* valuation of plaintiff's property, neither the rate nor
the return therefrom was unreasonably high; and (4) the
property of the plaintiff was grossly undervalued.

*Consideration of improper evidence by the Commission.*

In endeavoring to arrive at the original cost of the prop-
erty of the plaintiff the engineers employed by the *Commis-
sion* started with an inventory of the property made by Ford,
Bacon & Davis in 1900 for the people who were figuring on
consolidating the Duluth and Superior street railway lines
and buying the property in at the foreclosure sale.   The par-
ties making this appraisal were engineers.

The cost appraisal made by the engineers of the *Railroad
Commission* was considered by it in ascertaining the cost of
the property.   The appraisal was not formally offered in
evidence, was not exhibited to the plaintiff, and the parties
who made it were not sworn as witnesses on the hearing be-
fore the *Commission*.   No testimony was offered to show
that the inventory made by Ford, Bacon & Davis was correct.

The appellant insists that the *Commission* had no right to
consider the appraisal made by its engineers, particularly in-
asmuch as the same was based on an inventory made by other
parties and there was no evidence to establish the correctness

of the inventory.   Furthermore, that it was entitled to be
heard before the *Commission* in reference to the correctness
of the appraisal.

The inventory used ·by the engineers of the *Commission*
was obtained from the plaintiff.   As we understand the rec-
ord, this inventory, with the appraisal made by the engineers
of the *Commission,* was one of the files of its office when the
hearing was had, and might, we think, properly be considered
by the *Commission* under the decision in *Chicago & N. W. R.
Co. v. Railroad Comm.* 156 Wis. 47, 145 N. W. 216, 974.
Of course common fairness would dictate that the plaintiff be
advised of the appraisal made by the employees of the *Com-
mission,* if the *Commission* intended to use such figures as a
basis for decision.   We do not understand it to be claimed
that there was any intentional suppression by the *Commis-
sion* of evidentiary matters of this kind.

Should it be conceded in this case that the *Commission* did
consider improper evidence, we do not see what particular
significance would result from the concession.   The plaintiff
brought its action to set aside the award of the *Commission,*
and under the statute was entitled to a trial *de novo* in the cir-
cuit court.   It was not confined to the evidence used before
the *Commission,* and in fact offered considerable additional
testimony in the court action.   The decision, to be sure, threw
the onus upon the plaintiff, but still the proceeding in circuit
court was nothing more nor less than an original hearing.   If
new evidence was offered by the plaintiff on such hearing,
which was found to be different from that offered before the
*Commission,* the court was required to transmit a copy of the
evidence ·to the *Commission* and stay further proceedings for
fifteen days from the date of such transmission, unless the
parties stipulated in writing to the contrary.   Sec. 1797*m*—
67, Stats.

The plaintiff attacked this appraisal in the circuit court.
Because of the new evidence which it offered it had the right

to insist that the evidence go back to the *Commission* for reconsideration and for new findings. This right apparently was not insisted upon. The judgment appealed from rests on findings of fact and conclusions of law made by the circuit court. The evidence complained of related to the value of the plaintiff's property. The court has found on the evidence before it that the value fixed by the *Railroad Commission* was the correct value. It is not apparent how a mistake made by the *Railroad Commission* in considering the alleged improper evidence complained of could furnish any ground for a reversal of the judgment of the circuit court based on the evidence taken in that court, there being no complaint that improper evidence was admitted on the trial before the court.

The *International Harvester Co. Case,* 157 Wis. 167, 173, 147 N. W. 53, has no bearing whatever on the question here involved. The plaintiff in the present action was entitled to and had a trial *de novo* in the circuit court. The plaintiff in the other case was not entitled to such a trial, and of course did not have it. Under the statute there involved, the findings of the commission on the facts were conclusive if there was any evidence to support them, because its judgment could be set aside for jurisdictional defects only. If the industrial commission could return the evidence taken which showed no liability whatever, and at the same time state that, as a result of investigations made by it, it was satisfied that there was liability, and in this way sustain the award made, there would be no object in providing for an appeal to the courts, because no award could ever be set aside. Furthermore, it appears that little reliance was placed on this inventory in arriving at a conclusion.

Some complaint is made in reference to information gathered regarding probable use of tickets, which was not submitted to the plaintiff. In reference to this, the testimony showed that the information in question was used in the decision for illustrative purposes only and did not affect the conclusion reached in the case.

*Fixing reasonableness of return instead of reasonableness of rate.*

The further contention is made by the appellant that the *Railroad Commission* erroneously attempted to regulate the reasonableness of the plaintiff's return and not the reasonableness of the rate of charge, and that under the Public Utilities Law (sec. 1797—14) the *Commission* is authorized to reduce rates only when they are unreasonable, and that there is no evidence whatever to show that the rate of fare charged in the instant case was not reasonable. The *Commission* held that inasmuch as the rates charged yielded a return of more than seven and one-half per cent. per annum on the fair value of the property they were excessive, and because they were excessive they were unreasonable. This is at least the substance of the holding of the *Commission,* although the language used did not follow the statutory requirement very closely.

There is no formal finding that the rates charged were unreasonable, and under sec. 1797—14 the *Commission* does not have the power to change rates unless they are found to be unreasonable or discriminatory. The *Commission* does find that the rates charged were "somewhat higher than they should be." It then proceeds to fix a rate which it holds to be reasonable and adequate and which is considerably lower than that charged. There is a wide variance between the parties as to the amount of the annual reduction in revenue that will result from the order. Based on the 1913 business of the company, the estimates run from $17,695 to $35,095. The reduction in rates amounts to fifteen per cent. for those who desire to take advantage of the rate established. This is a substantial percentage, and the aggregate figures given are likewise substantial. If the rate found and established is a reasonable one, then the one which formerly existed was not so, and it follows that the *Commission* inferentially if not directly found the existing rate to be unreasonable. It must have been found excessive else no reduction would have been

made, and the difference between an excessive rate and an unreasonable one, if there is any, is purely theoretical.

It is argued that there is very little connection between the profit which a party makes out of a service performed and what it is worth, and that in determining the value of a thing like railroad transportation the question is not whether the profit is large or small, but what is the service actually worth to the public. It is also argued that this element was lost sight of by the *Commission* and that it based its idea of reasonableness solely on the amount of profit which plaintiff was making and regardless of what the service performed was worth.

The weakness of this test was no doubt apparent to counsel, because it was suggested rather than pressed. If it were adopted it would be extremely difficult for any one to say that a rate of ten cents a mile for carrying passengers on our railroads was unreasonable. So it is contended that the market value of the service should be deemed the reasonable value of it rather than its worth, and that inasmuch as a five-cent fare is charged in most cities, this fact establishes market value. If this should be established as a guiding principle, it would be impossible to make any compulsory reductions in rates no matter what economies might be practiced in the transportation business. Then it leaves out of account difference in conditions in different localities. A good many generalities which lead nowhere have been indulged in by courts and economists in reference to methods of establishing the value of railway properties, as well as the manner of determining the reasonableness of rates. Street railways are natural and necessary monopolies. At least such was the case before the advent of the "jitney" bus, and its usefulness is at least problematical. They are *quasi*-public corporations that are permitted to use the streets in the interest of public convenience and necessity. Our cities might, if they deemed it advisable, carry on the business themselves. So long as

they do not do so, it is pretty well established that the privately owned street railway should be permitted to earn its reasonable and necessary expenses, including a reasonable sum for depreciation, as well as a fair rate of return on the reasonable value of the investment. The amount of this return should be governed to some extent by the character of the management. A company that is on the alert to practice economies should have some part of the saving, else there would be no inducement to reduce the cost of the service. It is not our purpose here to discuss the elements that should be considered in fixing the cost of a service. It is not involved. But we think that net earning power is one of the most important elements to consider in ascertaining whether rates of fare are reasonable or otherwise. Where a monopoly is created by law, it is entirely proper and generally advisable that its power to take more than fairly belongs to it, to wit, a reasonable return on the reasonable value of the property, should be restricted. Investments of this character are permanent, and the risks are not very great unless bad judgment is used in building a road where there is no sufficient call for it to justify the expenditure. The cost of the service is the most definite and tangible guide there is to tie to in making rates, if indeed it is not the only one. Where rates are so adjusted as to yield a fair return on the value of the property over and above expenses and depreciation, they are reasonable. Where they are so fixed as to materially exceed this sum, they are not.

### Was a reasonable rate of return allowed?

The evidence in this case showed that the city of Superior was a thrifty, growing municipality, and that the revenue of the plaintiff, generally speaking, had shown a substantial increase with the increase in growth. There is nothing to indicate that the investment is unstable or that the revenues in the future will not be sufficient to pay operating expenses, maintenance, and a reasonable return on the investment.

By taking an indeterminate permit the railway company may continue its business indefinitely unless the utility is condemned in the manner provided for, and then the property must be paid for. Plaintiff is not in a position to say that its franchise will expire at the end of a certain time and it may not be renewed, and, if not, its property will have a junk value only, and it consequently must charge rates high enough to secure it against this contingency. There is very little of the speculative element in investing in the securities of the plaintiff on the basis of the valuation fixed by the *Commission*. It would seem to be safe, sound, and secure. Where the matter of reasonableness ends and where unreasonableness begins is somewhat difficult of ascertainment. It is a question of fact which the *Commission* primarily should decide, and when it makes a decision and that decision is approved by the trial court, it cannot be disturbed by this court unless it appears that the decision is clearly wrong.

As before stated, the *Commission* held that a return of seven and one-half per cent. per annum on the reasonable value of the property involved would be fair and adequate; that the rate charged yielded a materially larger return than this, and that the rate to be charged should be so adjusted as to yield substantially seven and one-half per cent. The plaintiff insists that a rate of seven and one-half per cent., considering the character of the business and the risks which follow it, is not reasonable compensation for the investment. It is not claimed that a rate which will yield such a return is confiscatory, and it is obvious that it is not. It is said, truthfully enough we think, that there is a difference between a rate that is not quite low enough to be condemned as confiscatory and one which is in fact reasonable, and it is a reasonable rate which the *Commission* is called upon to fix. This may all be conceded. But there is a good deal of difference between a rate which affords the investor the substantial return of seven and one-half per cent. and one so low that it

can be said that it practically deprives the owner of the beneficial use of his property and would substantially confiscate it in whole or in part if permitted to stand. Allusion has already been made to the substantial character of the investment in this case and to its probable continuity. What is a reasonable return is a question of fact, the solution of which calls for the exercise of sound judgment and common sense. Undoubtedly there are some risks attendant on such an investment that are not found in the case of a well placed loan on real estate. But the *Commission* has taken this into account by allowing a higher rate of return than the ordinary real-estate loan yields. It is also true that there are some speculative ventures that promise to yield a larger rate of return, and in fact do if they are successful. But while the rewards may be greater in case of success, the chances of failure are also greater, and the *Commission* seems to have adopted an intermediate figure between these two classes of investments, and its judgment in this regard, confirmed by the trial court, should not be disturbed. An abundance of authority might be cited to sustain the finding of the *Commission* in this regard. One of the leading cases on the point is *Willcox v. Consolidated Gas Co.* 212 U. S. 19, 48, 29 Sup. Ct. 192.

### Is order void because discriminatory?

It was held by the supreme court of the United States in *Lake Shore & M. S. R. Co. v. Smith,* 173 U. S. 684, 19 Sup. Ct. 565, that a state legislature could not fix a maximum rate of charge for the carrying of passengers and then compel the railroad company to sell mileage books at a lower rate, because such a law unjustly and unfairly discriminates against the purchaser of the ordinary trip ticket, and the law does not recognize wholesale and retail rates in matters of transportation.

It is argued that here a discrimination is practiced between those who desire to purchase only a single ride and in

favor of those who are able and willing to invest twenty-five cents in tickets. To so hold would amount to carrying the doctrine of discrimination to a ridiculous limit. The idea that it is a burden on any one who desires to patronize the street railway company to invest twenty-five cents in tickets is pretty far fetched. There is another and perhaps a better reason why the doctrine of the case above cited does not apply. The smallest fractional currency we have is one cent. A reduction in the rate of fare from five cents to four cents amounts to twenty per cent., and is a large reduction. It is not the law that a railroad commission, or the legislature for that matter, cannot reduce a rate of fare from five cents unless it reduces it to four, three, two, or one cent. Here the *Commission* evidently determined that a charge of four and one-sixth cents per passenger was as low as the rate should go. There is no way that such a rate could be put into effect without requiring the passenger to buy at least six tickets. Every one has a like privilege. The amount of investment here required in the first instance is too small to constitute a discrimination, and in the next place it is necessary that a bunch of tickets be sold such as was here determined upon in order to fix what is really a reasonable rate of fare.

### Alleged undervaluation of property.

The *Railroad Commission* placed a value of $700,000 on the property of the plaintiff. This included all of the property in Wisconsin used for railroad purposes and some in Duluth which was used in connection with the running of the street-car system in Wisconsin. The circuit court also found on the evidence before it that the value of this property was $700,000. The plaintiff insists that its property was grossly undervalued, and devotes a large part of its brief to a discussion of this subject.

The *Commission* made an attempt to arrive at the actual cost of the property in question. For the purpose of arriving at the cost, an inventory taken in 1900 for the plaintiff, by

the firm of engineers before referred to, was used. Some items were omitted in the calculation, and it is claimed that others were undervalued. The cost of additions from 1900 to 1911 was then computed, and, from the aggregate, what was deemed to be a proper deduction for depreciation was made. This constituted one of the items of evidence on which the *Commission* based its judgment, although perhaps not an important one.

The *Commission* also ascertained the theoretical cost of reproduction new of the property, and made what it considered proper deductions for depreciation, and it appears from the testimony that this item of evidence was considered a very important factor in fixing the valuation finally determined upon. In addition to the two factors mentioned, the *Commission* made an allowance for "going value." According to the evidence, the allowance on this account usually varies from five to ten per cent. of the reproduction cost of properties of this character. It was stated that in round figures about $50,000 was allowed for going value in the present instance. While the sum of $700,000 is not the result of adding values found as to a number of specific items, it appears pretty clearly that the controlling factors in arriving at this value were cost of reproduction and going value.

The important objections made to the *Commission's* valuation are:

(1) The plaintiff insists that its franchise had a substantial value, and that the *Commission* erroneously refused to allow anything for this item of property.

(2) Certain real estate in the city of Superior, aside from easements, owned by the plaintiff and used for railway purposes was omitted from the appraisal made. The value of this property was $2,000.

(3) The plaintiff also claims that a *pro rata* share of its investment in the Duluth Amusement Company, amounting to $2,476, should be added to the value of its property in

Wisconsin, and that this item was erroneously disallowed by the *Commission.*

(4) An allowance of at least fifteen per cent. should have been made on the reproduction cost found, to cover the cost of engineering, interest on money during construction, mistakes, and unforeseen contingencies. Had the fifteen per cent. basis been used, it would have increased the so-called present value of the property $11,453.

(5) At least twenty per cent. should have been added to the estimated cost of material and labor, on the theory that a plant having all of its parts co-ordinated into a harmonious whole is worth that much more than the cost of items which enter into the plant. The allowance of this claim would have increased the reproduction value of the property $165,063.

(6) Items omitted from the appraisal made by the *Commission,* to the amount of $28,030, should have been allowed, and it undervalued certain other items to the amount of $32,682.41, from which should be deducted overvaluations aggregating $3,586, making a net undervaluation on both items of $57,126.41.

(7) A large portion of the city of Superior was platted by the Land & River Improvement Company. Before recording its plat it conveyed to plaintiff's predecessor an easement in the streets designated on its plat for street railway purposes. The plaintiff has succeeded to these rights, which it asserts were worth from $400,000 to $500,000. No account was taken of such rights by the *Commission* or by the court in arriving at the $700,000 valuation which was placed upon the property. Plaintiff insists that this action was unwarranted and unlawful.

(8) Plaintiff further urges that, by reason of the Duluth and Superior street railways being owned and operated by the same company, it was able to practice economies in the operation of its road in Wisconsin aggregating over $7,000 a

year, and that this fact should have been taken into account, but was not, in determining the amount of revenue it was reasonably entitled to earn.

Some minor contentions are made regarding errors and omissions of the *Commission,* but they do not call for separate treatment.

The two principal witnesses who testified before the court on values were Mr. Haugen of the tax commission, for the plaintiff, and Mr. Erickson of the *Railroad Commission,* for the defendant. These two men should be as well qualified to speak on the value of the property involved as any two men in Wisconsin. Mr. Erickson, with the aid of a trained corps of assistants, has been largely engaged for a number of years in valuing street railroads and other public utilities, as the reports of the *Railroad Commission* show. Mr. Haugen has been doing the same kind of work with like aids for taxation purposes. Both occupy important official positions; both are men of recognized standing and ability; and both were undoubtedly expressing their honest and candid judgments. The reproduction cost of the property was arrived at by engineers employed jointly by the railroad and tax commissions; so that both had the same data as far as this particular item of evidence was involved. It is not unusual to have high grade experts differ widely in giving evidence on values when they are called by private interests. The fact that the experts in this case were disinterested and were employed by the state does not seem to have affected the general rule.

Mr. Haugen, answering a hypothetical question which included the various elements which it was said in the *Appleton Water Works Case* (154 Wis. 121, 148, 142 N. W. 476) should be taken into account in fixing the value of a public utility, testified that the value of the plaintiff's property in Wisconsin was $1,100,000, or $400,000 in excess of the value fixed by Mr. Erickson.

The plaintiff insists that in view of the errors made in the

figures of the *Railroad Commission,* and of its failure to take
into account numerous items of property that should have
been included, and the other evidence in the case, the finding
that the property was worth only $700,000 is not supported
by the evidence and should be set aside, and the valuation
made by Mr. Haugen adopted as being the true one.    Atten-
tion is also called to the fact that the plaintiff's property in
Wisconsin was assessed for the year in question at $1,100,000,
and that it is unfair and unwarranted to place one value on a
piece of property for rate-making purposes and to add about
fifty-eight per cent. to this value for taxation purposes.    This
latter contention is persuasive, but not necessarily accurate.
The earning power of a property of this kind has considerable
influence in fixing its present value.    Where returns are
large the stock and bond value is affected, and this factor may
be considered at least in ascertaining value for the purposes
of taxation, and Mr. Haugen testified that it was considered
by him.    Excessive earnings may be and generally are the
result of excessive rates, and if such earnings fixed in a large
measure the value of the property involved, it would be im-
possible to materially reduce rates no matter how excessive
they might be.    Once the reasonable value of a street railway
company is fixed for rate-making purposes, there might well
be merit in the contention that the value fixed on such property
for taxation should not materially exceed the value upon which
the company is permitted to earn a reasonable rate of return.
This question is not directly before us, and what is said is in-
tended only to meet the contention of the appellant that its
property should not be valued by the state at $700,000 for
one purpose and at $1,100,000 for another, where the lower
value results in ordering a substantial decrease in its earning
power and the higher one imposes an excessive burden in the
way of taxation.    Once the state has fixed a value for rate-
making purposes and restricted the earning power of the
road to a reasonable return on such value, it would seem rea-

sonable to claim at least that the property could not have a materially .higher value for purposes of taxation. While a valuation for taxation purposes may not fix the value for rate-making purposes, it may well be that a valuation for the latter purpose might substantially fix the value to be found for the former.

The question before us is whether the *Railroad Commission* made substantial errors in its method of fixing value, and whether Mr. Haugen adopted the correct method. As we understand his testimony, he took into account the physical value of the property, its earning power, and the franchise. It is probable that he also considered "going value," although he does not mention it specifically. He made no attempt to place any specific value on the franchise, but added about $400,000 to the physical and perhaps going values to cover the franchise value and the enhanced value because of earning power. Except as the *Railroad Commission* treated the plaintiff as a going concern capable of earning substantial returns on its Wisconsin property, it apparently added nothing for the franchise and nothing because of the fact that the company was earning an excessive amount on its property in this state. So the difference between the values fixed by the two experts for rate-making purposes arose quite largely from their different concepts of what considerations should be taken into account in fixing values.

### Franchise value.

(1) A reading of the testimony would lead to the conclusion that the *Commission* did not consider the plaintiff's franchise of any value and made no allowance therefor. It is true that no certain definite sum was fixed which represented the franchise value. We have no inclination to say that the *Railroad Commission* did things which it says it did not do, and still we think it necessarily took the plaintiff's franchise into account in fixing the value of its property. It was the franchise which gave the plaintiff the right to

operate its cars in the public streets.    Without a franchise to operate the property a large part of it would have only junk value.    The *Commission* valued the property on the basis that plaintiff was a going concern, having not only the right to operate its cars presently, but also in the future, so long as it owned the property.    It may not be correct to say that the difference between junk value and value as a going concern represents the value of the franchise, but it would seem clear that when value is fixed on the theory that the right to operate the property will be continuous (and that is the important right given by the franchise) an allowance is necessarily made for franchise value.    *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 108 N. W. 557.    Be this as it may, we hold that where, as here, the right exists at any time to regulate the rate of charge, all the allowance is made for franchise that should be made when a fair value is fixed upon the property based on the assumption that the business is a going one and that the owner will be permitted to carry it on in the future unless the municipality elects to buy for full and fair value.    If the plaintiff had a contract which entitled it to charge a five-cent fare until the expiration of its franchise and thus earn large returns in the meantime, such a franchise might be worth a good deal, but such a case is not before us. . Where, as here, only a reasonable rate may be charged under a franchise, it is difficult to see where it has very much value aside from the value of the privilege to operate, and that, as it appears to us, has been taken care of.    *Willcox v. Consolidated Gas Co.* 212 U. S. 19, 29 Sup. Ct. 192.

### Items (2) and (3).

Item (2) should have been taken into account.    Its omission was clearly an oversight.    We are not satisfied that the *Commission* was not correct in disallowing item (3).    An amusement park in Duluth might enhance the earnings of the plaintiff in Duluth and therefore be a paying investment, but it is not apparent that such an establishment was of any value

to the part of the property in Wisconsin. Besides, these two items, aggregating only $4,476, are too small to exert any influence over the final results arrived at in the case. These items might be considered substantial if this were a condemnation proceeding; but a variance of a few thousand dollars one way or the other would not have resulted in any different order in the instant case.

### Allowance for engineering, etc.

(4) It is of course apparent that a plant earns nothing during construction, although money may be invested in it for a considerable length of time. Further, that engineers must be employed and paid, and that some mistakes are bound to occur which will add something to the theoretical cost of the plant. In building an ordinary house it is easy to figure the cost in advance, but difficult in practice to keep within these figures. So in figuring reproduction cost it is usual to allow a lump sum to cover costs and contingencies of the character specified. This lump sum is figured as a certain percentage of the reproduction cost. Naturally there is a wide variance between experts and engineers as to what the per centum of allowance should be. The plaintiff claims from fifteen to twenty per cent. The *Commission* allowed twelve per cent. There is certainly evidence to support the finding of the *Commission,* and inasmuch as it was approved by the trial court it will not be disturbed by this court.

### Value of separate items which make up a plant as compared with value of plant after these items are co-ordinated.

(5) The claim made under this head is a large one, amounting to $165,063, and is based on the testimony given by Mr. Warren, the plaintiff's manager, to the effect that a co-ordinated plant was worth twenty per cent. more than the estimated cost of the items of property, labor, and material which go to make it up. This would seem on its face to be a pretty extravagant claim. Whether it is or not does not appear to be very material. As we understand the evidence,

the *Railroad Commission* determined what it would cost to reproduce the plant in the condition it was at the time of the hearing. This necessarily included the cost of co-ordination, and we think also its value. The reproduction cost of an article as an entirety necessarily includes the cost of putting it together. If Mr. Warren's evidence means, for instance, that after a new plant has been economically constructed twenty per cent. should be added to the sum expended to get at the actual cost, his claim could not be allowed.

*Alleged omissions and undervaluations by the Railroad Commission.*

(6) An attempt was made to arrive at the original cost of the property and also what it was worth on the basis of cost after making reasonable deductions for wear and tear, obsolescence, etc. The inventory made by Ford, Bacon & Davis was used as a starting point, and a value of $451,197 was placed on the property inventoried by them. To this amount was added the cost of additions from the time that inventory was made until the time of the hearing, which was ascertained to be $285,865. The value of the Duluth property used in connection with the running of the street railway in Superior was ascertained to be $87,944, making a total of $825,006. From this amount the sum of $61,929 was apparently deducted on account of track taken up, leaving a balance of $763,077. There is some discrepancy between the figures found in the testimony and this balance, the *Commission's* figures actually being $753,077. To this was added on the trial the sum of $28,030, for the cost of certain items omitted from the engineers' valuation, and also the sum of $30,940 to cover some differences on account of track taken up. The sum of these items was intended to cover the cost new, and amounted to $822,047, but appears in the record as $812,047. The *Commission* then ascertained as best it might the value of the plant on the basis of cost, after deducting what was thought to be a reasonable sum for depre-

ciation. The value of the property inventoried by Ford, Bacon & Davis in 1900, less depreciation, was found to be $257,333. The additions thereafter made were found to be worth $181,490, and the value of the Duluth property used in connection with the Superior plant, properly depreciated, $58,920. To this was added a depreciation charge found on the books of the company amounting to $95,362, and working capital of $20,000, making a total of $613,105. From this total was deducted for track taken up, $37,157, leaving a balance of $575,948. Mr. Erickson, in his testimony, stated that to this sum might properly be added some items that were omitted and some errors in figuring in relation to track taken up, amounting to $39,520, making the total value on the basis of cost $615,468.

It is claimed that some additional allowance should be made for undervaluations, but if the undisputed testimony be taken as true, that substantially $50,000 was allowed for going value, then the omission of those items would not cut any particular figure. It was shown in the testimony that, while the ascertainment of cost is desirable, it is not a safe guide to tie to and is not considered especially important in arriving at final results. At least no such importance is attached to it as is to reproduction cost. This is due to the fact that it is very difficult in most cases to arrive at cost where a plant has been constructed for a long time, and it is also difficult to ascertain whether the cost has been kept within reasonable bounds.

It is quite apparent from the whole testimony that if the omitted items had been considered by the *Commission,* and it had allowed the valuation on other items contained in Exhibits 117 and 118 of the record, which it was claimed should have been allowed, the final result would have been precisely the same.

The cost of reproduction new was found to be $805,482, and the depreciated value of the property, because of wear

and tear and the like, was found to be $651,605. As we understand the testimony, there is no claim that in ascertaining this reproduction cost any items of property were omitted. Neither is it claimed, as we understand the testimony and the concessions of counsel, that the cost of reproduction new and this cost less depreciation were not correctly ascertained by the *Commission*, except in one particular, and that relates to the allowance of twelve per cent. to cover the cost of engineering, etc., instead of an allowance of fifteen per cent. which the plaintiff claims should have been made. This contention has already been treated. On this basis an allowance of substantially $50,000 was made for going value, and there is little evidence that would justify the allowance of a materially larger sum on this account. If the method of ascertaining value which was pursued was a proper one, we think the finding of the *Commission* is well sustained by the testimony, provided error was not committed in excluding an item of property which will next be considered.

### Value of easements.

(7) The amount claimed for right-of-way easements conveyed by the Land & River Improvement Company is large,— from $400,000 to $500,000. Nothing was allowed by the *Commission* for them. The respondent insists that the easements were void because repugnant to the grant to the public by the dedication, and that in any event they were worth nothing in connection with the railway property. The purpose of the grant of right of way presumably was to insure to the grantee the right to build a street railroad in the city to the exclusion of all other persons. The validity of such attempted disposal of an interest in a street already laid out on a plat which was intended to be and was soon thereafter recorded, may well be doubted. A court would hesitate to hold, except where the law was plain, that a person platting land could put it within the power of an individual to block

or even hamper the building of an improvement like a street railroad.    We do not find it necessary to decide the question.

The plaintiff could not lay its rails or operate its cars without the consent of the city.    Such consent was given and the railroad was built and operated, in pursuance of the franchise granted by the town of Superior and the one subsequently granted by the city, for a period of over twenty years.    It is difficult to see wherein the easement granted by the Land & River Improvement Company was used or useful in carrying on the plaintiff's business, unless it might be in one particular, to which reference is not made and concerning which there is no proof.    It is not pointed out in what respect the plaintiff has been better off in the past or will be better off in the future by reason of the conveyance of this easement.    The evidence neither shows nor tends to show benefit.    It may be that if the plaintiff desired and should be permitted to carry freight in the future, this grant, if valid, would be beneficial in dealing with abutting owners who made a claim that an additional servitude was being imposed on their property. The same might be true in regard to the running of interurban cars.    But no evidence was directed toward these matters, and there is nothing to indicate that the rights attempted to be conveyed have anything more than a shadow of value. The evidence of two witnesses, to the effect that these rights which were attempted to be conveyed for the nominal sum of $10 in 1884 are now worth $400,000 to $500,000, is well nigh ridiculous.

### Economies from joint operation.

(8) This contention would argue perhaps for a more liberal return in the way of income rather than an increase in valuation.    The plaintiff claimed a large saving by reason of the car lines in the two cities being under one management and control and supplied with power from a single plant. Mr. Erickson admitted that theoretically there should be

some saving, but that practically such method of operation did not result in economy, or, if it did, the amount saved was so small as to be negligible.    There is simply a dispute in testimony on this point, which we assume the court resolved in favor of the defendant.

### Method of arriving at valuation.

It is apparent that a substantial sum was allowed for going value.    This allowance necessarily presupposed and took into consideration the fact that the property was in a position to earn a fair return on the reasonable value of it.    A plant that has been in existence as long as this one that was incapable of paying dividends might of course have a going value, but it would be very small.    Such a property would hardly be salable at the bare cost of reproduction less depreciation.    As stated before, a franchise value, or at least something akin to it, was necessarily taken into account.

It is said in the *Appleton Case* (154 Wis. 121, 142 N. W. 476) that the value of the plant and business is an indivisible gross amount and that it is not obtained by adding up a number of separate items, but by taking a comprehensive view of each and all of the elements of property, tangible and intangible, including property rights, and considering them all, not as separate things, but as inseparable parts of one harmonious entity and exercising the judgment as to the value of that entity.

What the *Commission* here did was to fix a value on the property of the plaintiff as a whole.    The *Commission* seems to have taken into account every kind of property, tangible and intangible, which should be considered in fixing a valuation.    No doubt the reproduction cost was considered a very important item in arriving at the value of this plant, and we think correctly so.    But the value was not fixed on the basis of what it would cost to reproduce the plant.    It is important that some method of arriving at value be worked out which has something tangible for a basis, if such method be possible

and does not work injustice to the utility owner or the public. Mere opinions on the value of property of this kind, based on superficial observation, are of little value. We think the *Commission* did not adopt an erroneous theory as to how value should be fixed, and that its finding on value is fairly sustained by the evidence.

We desire to acknowledge our indebtedness to counsel for the clear and concise presentation made of the numerous questions involved in their briefs and oral arguments. They have done their full duty by their clients and the court.

*By the Court.*—Judgment affirmed.

MARSHALL, J., dissents for reasons stated at length in *Milwaukee E. R. & L. Co. v. Railroad Comm.* 153 Wis. 592, 630, 142 N. W. 491, and *Minneapolis, St. P. & S. S. M. R. Co. v. Menasha W. W. Co.* 159 Wis. 130, 138, 150 N. W. 411.

A motion for a rehearing was denied, with $10 costs, on October 5, 1915.