# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed May 3, 1917.

THE HAVRE DE GRACE AND
PERRYVILLE BRIDGE
COMPANY
VS.
THE PUBLIC SERVICE COMMIS-
SION OF MARYLAND.

*W. Calvin Chesnut* and *Thos. H. Robinson* for plaintiff.

*Osborne I. Yellott* and *W. Cabell Bruce* for defendant.

BOND, J.—

The case comes before the Court on a bill to enjoin the enforcement of orders of the Public Service Commission, which fixed a new schedule of rates for passage over the Susquehanna River highway bridge, between Havre de Grace and Perryville. With some modifications for convenience the method followed by the Commission was that of calculating the total income which seem necessary to give the company a fair return on the value of the bridge as estimated by the Commission; and the company has been ordered to adopt a specific schedule of rates designed to yield this income and meet some demands of convenience in the particular case. The orders made a reduction of about one-half from the rates previously charged by the company. And the company has now complained that the new rates are unreasonable within the meaning of the statutes which govern the Commission, so that the orders fixing them are beyond the power and authority given by the Legislature, and further, that this reduction is in effect confiscatory and thus beyond the legislative power. The facts are fully set out in the opinion filed by the Commission, and it will serve no useful purpose, that I can see, to add a further statement of them here.

The plaintiff earnestly contends, first, that the Commission has proceeded on the wrong quest throughout in taking as the main object of its inquiry the determination of the question how much money it is reasonable for the company to make. This object, it is contended, is not that of the Legislature in its provision that just and reasonable rates shall be fixed, and the Commission's finding is, therefore, not an exercise of the statutory authority.

Of course, the Legislature might fix rates directly, by statute, and its determination would be conclusive if those rates should be sufficient to avoid what is generally referred to as "confiscation" of the owners' property. In reviewing that action a court would be concerned only with the possibility of confiscation and the constitutional limitation at that point. But when the Legislature directs a special commission to make the inquiry and fix the rates, then there arises an additional question of statutory limitations; the question of adherence to the directions in the act. The statute may direct the Commission to fix rates at any point which avoids confiscation, vesting the Commission with the full legislative power over the subject. Or, it may direct that rates be fixed by some other standard, removed from the point at which confiscation would result. In our statute, as in similar statutes in many other states, the Commission has been directed merely to fix rates which will be "just and reasonable," of "reasonable and lawful." Section 43 provides for a judicial proceeding to vacate any order of the Commission "on the ground that the rate or rates * * * fixed in such order is unlawful or that any such regulation * * * is unreasonable." The plaintiff contends that this

means that the rates fixed by the Commission must not only avoid confiscation, but that they must answer a test of unreasonableness and fairness other than that, and above it, a test in the application of which the prohibition against confiscation is relevant only as opposing a minimum limit. And the authorities appear to support this distinction.

"From what has already been said the rates charged to the general public must be reasonable, not, however, to the point of being confiscatory. But 'the point of injustice is reached long before that of confiscation.'"

Penna. R. R. Co. vs. Public Service Comm., 126 Md. 76, 77.

"It is said, truthfully enough, we think, that there is a difference between a rate that is not quite low enough to be condemned as confiscatory and one which is in fact reasonable, and it is a reasonable rate the Commission is called upon to fix."

Duluth St. Ry. Co. vs. Railroad Commission, 161 Wis. 245, 261 &c. (1915).

M. St. P. & M. R. Co. vs. Railroad Commission, 136 Wis. 146.

Union Pacific Railroad Co. vs. Public Utilities Comm., 148 Pac. Rep. 667 (Kans., 1915).

Detroit, &c., R. Co. vs. Railroad Commission, 171 Mich. 335, 346 (1912).

Although no point is made of it in this case, it may be well to note that Section 43 can hardly be taken to distinguish between "unreasonable" and "unlawful," in the provision that the court may consider a complaint that rates are merely "unlawful." All through the statute, and in the decisions of the Court of Appeals, the words are used without distinction; and the court is held bound to consider complaints concerning the unreasonableness of rates. The point was raised and decided in accordance with this view in the case of M. St. P. & M. R. Co. vs. Railroad Commission, 136 Wis. 146.

This conclusion that the State statute means to have rates fixed somewhere removed from the point of confiscation, that reasonableness is to be measured by a test other than that of confiscation, makes it necessary for us to be cautious in following the many Federal decisions and decisions of other state courts which have been concerned

only with the constitutional limitation. All the more so as the same words, "reasonable" and "unreasonable" are commonly used in them with other various meanings.

See Reeder on Validity of Rate Regulations, Secs. 47 and 48.

The plaintiff argues that unreasonableness of a charge is a familiar common law conception, and the Legislature intended nothing new and strange in the use of the words "unreasonable and just." A reasonable charge, it is urged, is a charge of such amount as it is reasonable for a single customer to pay for the service he himself gets, measured by the value of the service to him. And emphasis is laid upon the argument that it should be the reasonable value to each individual user, and not a fraction of an aggregate year's payment by the theoretical aggregate of the public. Conversely, it is not the business of the Commission to determine how much money a public utility corporation should make, and hence it has no concern at all with questions of valuation and fair return upon the valuation, except in so far as it may be necessary to consider the constitutional limit in that direction.

It is, of course, true, as the plaintiff points out, that reasonableness of a carrier's charges at common law was estimated without placing a maximum on his percentage of earnings. In earlier days we regulated fares of hacks, cabs and street cars without concerning ourselves to any considerable extent with the owner's profit. And today, in ordinary trade no study of the trader's margin of profit is made when it is necessary to fix a reasonable charge for his goods or services. Again there is logic in the argument that if reasonableness of a charge should be estimated at all upon the basis of the one party's business profit, the customers' profits is also a relevant and fair subject of inquiry. (John Warson Ltd. vs. The Caledonia Railway [1901] 3 Fraser 791). It is pointed out that in England today the reasonableness of rates for utilities is fixed on another basis, and that decisions in this country have approved the English view.

The leading English case on the subject is that of Canada Southern Railway Co. vs. International Bridge Co., 8 App. Cas. 723 (1883), a case which involved rates on the Niagara River

bridge, Lord Chancellor Selbourne there said, p. 731: "It certainly appears to their Lordships that the principle must be, when reasonableness comes in question, not what profit it may be reasonable for a company to make, but what it is reasonable to charge to the person who is charged. That is the only thing he is concerned with. They do not say that the case may not be imagined of the results to a company being so enormously disproportionate to the money laid out upon the undertaking as to make that of itself possibly some evidence that the charge is unreasonable, with reference to the person against whom it is charged. But that is merely imaginary. Here we have got a perfectly reasonable scale of charges in everything which is to be regarded as material to the person against whom the charge is made. One of their Lordships asked counsel at the bar to point out which of these charges were unreasonable. It was not found possible to do so. In point of fact, every one of them seems to be, when examined with reference to the service rendered and the benefit to the person receiving that service, perfectly unexceptionable, according to any standard of reasonableness which can be suggested. That being so, it seems to their Lordships that it would be a very extraordinary thing indeed, unless the legislature had expressly said so, to hold that the persons using the bridge could claim a right to take the whole account of the company, to dissect their capital account, and to dissect their income account, to allow this item and disallow that, and after manipulating the accounts in their own way, to ask the court to say that the persons who have projected such an undertaking as this, who have encountered all the original risks of executing it, who are still subject to the risks which from natural and other causes every such undertaking is subject to, and who may possibly, as in the case alluded to by the learned judge in the court below, the case of the Tay Bridge, have the whole thing swept away in a moment, are to be regarded as making unreasonable charges, not because it is otherwise than fair for the railway company using the bridge to pay those charges, but because the bridge company gets a dividend, which is alleged to amount, at the utmost, to 15 per cent. Their Lordships can hardly characterize that argument as anything than preposterous."

Bickett Smith & Co. Ltd. vs. Midland Ry. Co., 65 L. J. Q. B. 274, 277 (1895).

John Watson Ltd. vs. The Caledonia Ry. Co. (1901) 3 Fraser 791.

In Cotting vs. Kansas City Stock Yards Co., 183 U. S., 79, Justice Brewer applied the same principles to a business which is not ordinarily to be classed with public utilities, but which because of special circumstances has acquired a local monopoly, "which only because of the conditions of its use becomes such as the public has an interest in." After quoting from the International Bridge Co. case the extract quoted here, above, Justice Brewer added (183 U. S., pages 95-97):

"The question is always not what does he make as the aggregate of his profits, but what is the value of the services which he renders to the one seeking and receiving such services. Of course, it may sometimes be, as suggested in the opinion of Lord Chancellor Selborne, that the amount of aggregate profits may be a factor in considering the question of the reasonableness of the charges, but it is only one factor, and is not that which finally determines the question of reasonableness. Now, the controversy in the Circuit Court proceeded upon the theory that the aggregate of profits was the pivotal fact. To that the testimony was adduced, upon it the findings of the master were made, and in recognition of that fact the opinion of the court was announced. Obviously, as we think, in all this the lines of inquiry were too narrowly pursued."

Such appears to have been the opinion of Justice Brewer and Peckham, and Chief Justice Fuller. The remaining six justices refrained from expressing an opinion upon any point except the constitutional objection that the defendant in that proceeding had been isolated for statutory regulation and so had been denied equal protection of the laws. It was on this constitutional point that the case was decided.

The same principles were approved in Public Service Gas Co. vs. Board of Public Utility Commissioners, 84 N. J. L. 463, applying a statute in which the Commissioners were required to deter-

mine "just and reasonable *individual* rates."

And see Kennebec Water District vs. Waterville, 97 Maine, 185.

The more familiar practice of commissions in this country is at odds with this argument. The question is nearly always treated as one of a fair return to the corporation upon the property used. And it seems undeniable that there has grown up a belief, widely follows, that the direct object of all public utility rate regulation in this country is to relieve the users of utilities of all possible outlay by cutting the returns to the stockholders in the utility companies down to the lowest possible maximum. Most of the judicial decisions on the subject have had to do with the constitutional limitation, either directly or upon a construction that the public service statutes under discussion merely re-enacted that limitation. And we must consider the possibility that following the lead of these constitutional decisions, we may have overlooked the true intention of the Legislature, and the content of the question submitted to the Commission in a statute such as ours.

The familiar measure of reasonableness to which the plaintiff refers is that of charges at the level fixed in competitive trade. Such charges are still accepted as economically fair, and satisfactory in ordinary trade; and in so far as the same satisfactory standard is available the statute may intend that it should be followed. But the practical test of reasonableness which it assumes is ordinarily lacking when we come to deal with public utilities. Then as a rule, the only available measure of what it is reasonable for the user to pay is what justice and reasonableness require that the owners should receive.

It cannot be said that the test of a fair return to the owners is the only test; the cases cited refute that. And as the Commission points out in this case, a charge that is reasonable to the consumer, measured by an external standard, is insisted upon in cases of conflict, and must prevail, even when the owners can earn no profits at all on the basis of that charge. (Covington Turnpike Co. vs. Stanford, 164 U. S. 578). It may again happen that in fixing rates for a business which has become a utility only by peculiar circumstances a fair measure of reasonable rates may be afforded by competition in the business elsewhere. That I take to have been the situation, in part at least, which was before Justice Brewer in the Kansas City Stock Yards case (183 U. S. 79). Similar local monopolies on which the rates are otherwise established may furnish a satisfactory measure of reasonableness for the particular monopoly which is made the subject of inquiry. It seems likely that the judges in the International Bridge Co. case (8 App. Cas. 731) had in mind the tolls which were facts of familiar experience. Where such comparisons are available it may be found fairer to prefer the standard of reasonableness which they give to that of a fair return to the owners, which at best is difficult to handle, and in many respects uncertain and unsatisfactory. We must acknowledge the possibility of preferring the former unless we are to declare that the purpose of the Legislature in any case is to deny those who invest in a public utility property the right to receive rates of such established reasonableness if in the aggregate they should receive from them more than an arbitrary maximum of income, or, in other words, that it is the direct purpose of the Legislature to favor the users, relieving them of all possible outlay, by cutting off the stockholders in all cases from profits beyond the arbitrary maximum. Despite the fact that this is frequently assumed to be the purpose of all such statutes, there is, of course, nothing in the statute itself which declares such a purpose. And while our philosophy may ultimately settle upon this doctrine, I question whether in the legislation in Maryland it was the intention to adopt it.

But when a standard of rates is not furnished by competitive trade, and no satisfactory basis of reasonableness is afforded by other monopolies, the Commission has no adequate measure outside of that of a fair return on the property. Except for that it could, as I see it, resort only to an arbitrary basis, as was done in the English Railway and Canal Traffic Act of 1894, which took the rates existing on December 31, 1892, as beyond question; or it would have to be guided only by a sense of reasonableness, measured by no definite standard, but derived from experience in the affairs of its

day and generation indefinitely. The last process was apparently that which we adopted in this country in the earlier regulation of cab fares and the like. But there is no arbitrary test of rates for the Commission to follow here, and it is notoriously the purpose of our modern legislation to direct a more searching inquiry into the reasonableness of rates than was made for the early regulation of cab fares.

Furthermore, even where an outside standard of reasonableness may be available, it will usually be found necessary to apply the test of a fair return to the owners, for reasonableness must be measured from both sides. And in the allowance of a fair return upon the property the demands of fairness and equal treatment for the citizens who invest their money in the utility can be, and should be, fully met.

The Act of 1908, Chapter 542, which incorporated the Bridge Company provided that the tolls to be charged should in no case exceed the tolls which the Conowingo Bridge Company was authorized to charge by the Act of 1858, Chapter 217, its charter. Except as to rates for automobiles, which were, of course, not mentioned in the Conowingo Bridge Act, the rates adopted by the plaintiff company, and now prohibited by the Commission, were lower than those fixed by the Conowingo Bridge Company. The rates adopted for automobiles were also lower than those recently in force for the Conowingo Bridge. As the Commission says, a comparison of rates of other bridges in the State, multiplied to fit the same length of crossing, shows an average charge on the others greater than the charge heretofore made for this bridge. Fares for transportation by railroad over this bridge, and on such ferries as were available, were also higher than the rates adopted by the plaintiff. These facts are noticed by the Commission, and it found them "of some interest in arriving at the degree of benefit to the public of transportation across the Susquehanna River by means of the bridge in question and consequent value of the structure from the standpoint of the public." It seems, however, that these considerations furnished little aid to the Commission in the calculation of the rates now ordered.

The facts may, perhaps, be of more importance than the Commission considered them to be, but I cannot say that it was at all unreasonable to reject as inconclusive the measure of rates which they furnished, and to resort to the calculation of a fair return to the stockholders. These other toll bridges are also local monopolies, and their charges, unregulated by competition as they are, may be above reasonable height. The Commission may have found that all such monopolies in their freedom from restraint, have tended for a long time to raise their rates beyond reason. The bridge with which regulation begins must necessarily be studied alone, for the most part, without relation to the other bridges and their rates. It is not contended that the Act of 1908 furnished any more conclusive measure of reasonableness of rates.

The method followed by the Commission in this respect seems, therefore, to have been the only practicable one, as it is in most instances.

Duluth St. R. Co. vs. Railroad Commission, 161 Wis. 245, 260.

## BASIS OF CALCULATION OF FAIR RETURN.

In determining what should be the basis of the return to be calculated, the Commission had a question of more difficulty than usual. The bridge was built fifty years ago, at a cost of over $1,250,000. When railroad traffic had outgrown it, it was abandoned by the railroad company; and under the orders of the Secretary of War it was about to be torn down when the present owners took it over for highway use. No money was paid to the railroad company for the bridge, and an amount which is negligible in this discussion was all that was necessary to adapt it to the new use. The original construction cost included outlays for much that was experimental, and, because of that fact and of the great improvement since in construction methods, furnished no test of present values. And there was no cost to the new enterprise. There was, therefore, no question of resorting to original cost as the basis of return. The Commission remarks that there was a contention among users of the bridge that the profits should be confined to a percentage on the small amount laid out in the work of adapting the bridge to

highway use, the actual money sacrificed by the present owners. Now that the venture has proved highly profitable it is, perhaps, inevitable that users should begrudge paying the profit. This is especially likely since tolls have become unfamiliar charges, and almost any amount will be an unusual exaction.

The Commission, however, rejected the test of the actual outlay by the present owners and resorted to an appraisal of value measured by cost of reproduction. And this seems just and reasonable. While the bridge was acquired as salvage after the railroad company was compelled to abandon it, an obviously valuable property was saved. The new owners acquired exactly what the railroad company would have had if it had itself adapted and maintained the bridge for highway use. They acquired a serviceable bridge which would have exactly the value of any other bridge of the same serviceableness which might now be constructed there. Travelers are given the same service as they would receive upon such another bridge. The State might have built another at the expense of all the taxpayers, but now that this service is left to private individuals and private property is availed of for it, justice and reasonableness require that the owners be conceded this value and the right to receive a fair margin of profit on it. The Commission's reasoning on this is conclusive, I think. And it is necessary that this starting point be kept clearly in mind. The Commission is to fix rates upon the property devoted to the service, and not merely to award the owners' interest on their original money outlay as if the money had been loaned to the public to acquire a bridge of its own. This is required by authority and by our present notions of reasonableness and of the rights of private property. I take it to be clear that it was not the intention of the legislature to invade the rights of private property, as previously conceived, to the extent of depriving owners of the advantage of any unusual bargain in acquiring the property, and to appropriate that for the general public. On the contrary, I take it, utility property is conceived of as still having an intrinsic worth, even without relation to earning power (which is at the other end of the problem), and that

this worth would be the same no matter how great or how little the outlay by which it was acquired.

The property acquired was not a railroad bridge, however. The bridge had descended to its next best utility; and it was as a highway bridge that the Commission had to value it. There was an excess of material and strength in the actual bridge over and above the needs of highway travel, and that was waste which could not fairly be discounted part of the property devoted to highway use. To get the value of the highway bridge in it, so to speak, the Commission therefore resorted to an estimate of a substitute bridge, an adequate highway bridge. And that plan is accepted by both sides to the controversy as proper, if there is to be any valuation at all.

## VALUATION.

Coming, then, to the objections to the Commission's conclusions in following out this plan of valuation. The plaintiff complains that the Commission greatly underestimated the cost of reproducing the supposed adequate highway bridge, first, by adopting an estimate of cost of new construction which was opposed to the weight of the evidence. The company itself presented the testimony of several leading bridge engineers on this point of cost of reproduction, new; and the Commission presented that of its own engineer and of other engineers employed in various public works in the State. The Commission accepted the lowest estimate within the evidence, and then, deducting an amount equal to about 28½ per cent. for various forms of depreciation and some other elements, arrived at a valuation of $250,000. But the court could not, I think, interfere and restrain the Commission's orders merely because it might entertain a different view of the weight of this evidence. I agree that it is possible that in some cases the evidence on which a commission relies might appear to a court so unsubstantial, and such an unreasonable reliance, that the court should restrain the orders based upon it; but I have concluded that such a situation is not presented here. The estimate which the Commission accepted had some substantial evidence supporting it, and a court would not be justified in ruling that any conclusion of its own to the contrary must

be preferred—unless it be that some of the principles followed in the accepted estimate seem 'to the court clearly erroneous.

In only three respects do I find myself in disagreement on the principles which were followed in the estimate of cost. The cost of material was taken from prices in existence at a selected time before the present war, which were assumed to be normal prices. Putting aside the wisdom of this choice as a question for the Commission rather than for the court, it seems unreasonable to ignore the trend of prices altogether. This process produces a valuation for the past, whereas the valuation is made for the present and the future as well as for the past. The Commission is undertaking to fix rates which in future years will give a fair return on the property as it will then stand. Again, after having resorted to the estimate of cost of reproducing a substitute bridge, the Commission returns in part to the theory of valuing the existing structure and disallows the percentage for contingencies or outlays which preliminary estimates cannot foretell. As I see it, the Commission's estimate is to be the same as a preliminary estimate for new work, and so should include the usual allowance for contingencies. The value of the land under the shore approaches to the bridge should be included. The Commission omitted it. An allowance for promotion expenses was made by the Commission, but its counsel questions the correctness of this addition. It seems to me imperative if we adhere to the method of calculating the return on the cost of reproduction. It is an inevitable item of expense for all except large corporations which have much of such work done, and so have promotion arranged for in previous general outlays; and even then some such expense is incurred, though it is widely distributed.

## DEPRECIATION.

After having arrived at an estimate of the cost of the construction needed in an adequate highway bridge, then, to fit this for a test of value in the actual bridge, the Commission, as has been said, proceeded to make allowances for depreciation from wear. There appears to be little visible depreciation of the actual bridge beyond the reach of minor repairs. But the Commission found that there was some impairment visible, and concluded there must be more not visible. It does not, in its opinion, give a detailed statement of its deductions made on this account, and does not definitely state its method of calculation. Depreciation is, of course, not a matter of exact calculation. The Commission appears to have followed to some extent, in its study, the method which is called "theoretical depreciation"—that is to say, it estimated the life of the actual bridge, then deducted from the reproduction cost of the substitute bridge such a proportion as the time during which the actual bridge has stood bears to the whole of its estimated life. To the use of this process the plaintiff objects.

The objections usually urged against theoretical depreciation are not all pertinent in this instance, however well founded they may be in others. The bridge is not a plant made up of many units varying in respect to use and wear and obsolescence from change in the arts; it is not such a composite property as would be rebuilt piecemeal as disused of part by part becomes necessary. There would be danger in using an engineer's estimate of life as a prediction of the end of that life, for it is not that. It appears to be rather an arbitrary basis for corporate accounting and depreciation funds, and to be consistent with a probability of much longer life. And apart from this objection the method would not give a complete test for this bridge, as the only money estimates are those for a supposed bridge of different materials and different strength. We do not, of course, get similar results by subtracting similar fractions from unequal quantities. The actual bridge has an excess of strength and materials, and may have much more strength and value in it now than would be left in the supposed substitute bridge after fifty years. And the plaintiff complains of the absence of any allowance for this excess.

But, although the Commission dwells upon it somewhat, it did not follow this fellow so closely. Its express statement to the contrary, as well as the figures, make that clear. It seems to have been merely seeking the best guidance available to measure actual depreciation, which, after all, is not exactly measurable. I see no founda-

tion for holding that it did not make proper allowances in respect to these differences. The total deduction is large, but I cannot find in that alone any ground for disputing it.

There was included in the deduction some allowance for the fact that the existing bridge is only 13 feet wide, a width which the Commission found inadequate for the probable demand. Deduction for this is also contested. But it seems to me not unreasonable. If the bridge is of inconvenient width, and somewhat of a makeshift, to that extent it may not be worth the money it would cost to erect it.

Much was said in argument about depreciation for obsolescence. The Commission mentions this as a source of depreciation, but I do not see that it has made any deduction for depreciation from that source. I do not see how there could be obsolescence of a highway bridge. Obsolescence means approach to unfitness and disuse of an appliance in the service to which it is now put, usually by a change in the art.

Further deductions, undetermined in amount, were made for elements of value which were contributed by the public to the enterprise, and which the Commission thought should, in determining the basis of rates, offset to some extent the value of the plant measured by its reproduction cost. The Commission thought these contributions raised "equities" in favor of the public; and the owners deny this. The first is an allowance for an exemption from county and municipal taxes bestowed upon the enterprise, or attempted to be bestowed upon it, by the General Assembly in the act of incorporation. There is a question, based upon the authority of the decision of the Court of Appeals in the case of Baltimore City vs. Starr M. P. Church, 106 Md. 281, whether there can be any such exemption, despite the legislative enactment. The State Tax Commission has questioned the exemption and assessed the stock for taxation, and the owners express a readiness to yield the point. The Public Service Commission has before it, however, only the legislative declaration, and until that is set aside in due course it seems proper for the Commission to treat the exemption as a fact. I do not decide here the question of law which has been suggested. It has not been argued. And accepting the

exemption as a fact, it was, in my opinion, reasonable to treat it as an offset in determining the basis of return which the owners should receive from their rates. It is a release of a burden which constitutes a considerable contribution to the owners; and it is fair to give recognition to that fact in fixing rates. There might be some difference of opinion on the place where such an offset should be made, whether it should be in fixing the basis of return or in calculating the fair return on that basis; but it is possible to make the allowance fairly under either head, and I see no ground for questioning the result of this item.

The Commission made allowance for another equity to which it attached much importance. It concluded that "the present productive and therefore actual value" of the property to its owners consisted mainly in what the Commission called the franchise to maintain the bridge as a part of the improved State Highway leading from Baltimore to Elkton. A few years after the bridge was opened as a highway bridge, the State constructed improved highways leading to each end of it and thus with the bridge made the through highway spoken of. And, says the Commission in its opinion, "those acts of the State in creating the Bridge Company and giving it the right to exist at this particular point by charging tolls to those who must of choice or necessity use its bridge, constitute the franchise of the company, and to that franchise, as we have seen, is attributable the entire productive value of the property." These facts, the Commission thought, must be taken into consideration in ascertaining the fair value of the property for ratemaking purposes.

Strictly speaking, I think, there are no franchise values to be considered. The owners claim none. The privilege of corporate existence, and the right to earn money from the use of property are necessarily presupposed in any discussion of a fair rate of earnings. They are the conditions to the exercise of any business, not such special privileges as are usually classed as franchises. In these respects utility properties and others stand on the same footing. They are, I think, elements with which the Commission has no concern in the problem placed before it. And I do not see how the special origin of any franchises could serve as

a reason for deduction in the valuation of the property, if in the first place franchises are not claimed by the owners and are not to be allowed to them as elements of value. But the use of the word "franchise" in this connection is confusing. What the Commission has done is to advance an offset against the valuation arrived at by the ordinary method of estimating reproduction cost. It had started out to find the cost of reproduction of an adequate highway bridge; then by deducting appropriate amounts for inadequacy and wear, to make an estimate of value which would fit the actual bridge turned over to highway use. But having gone so far it thought that valuation unsatisfactory as a basis of rates in the particular case, and made some qualification because of the fact that the greater portion of the business of the bridge was brought to it by the construction of the improved highways which made the bridge a link in a long line of travel. This value which consists in business opportunity, is, of course, not a factor in the estimate of the cost of reproduction. It is not an element of depreciation. It has reference to an entirely different quality in the property, and could figure in the Commission's problem only as a sort of set-off made necessary because the cost of reproduction new, less depreciation, does not under peculiar circumstances in the case furnish a just and reasonable basis of rates.

As to the facts, it is not correct to say that the whole of the business of the bridge came from the improved roadway, or that all of the value which consists in earning power came from that source. At the outset the bridge connected two towns and the county roads which gathered in them. In that situation it had some business, and had some assurance of increase. And there is strength in the owners' argument that the bridge may, on the other hand, be said to have made the roads possible; that the public demand which each contributed to supply constituted a business opportunity to which the owners were entitled as part of their purchase. A more important difficulty arises from the fact that in the regulation which the Commission has undertaken the advantage of business opportunity, over and above a fair return on the value of the property for the use to which it is to be put, is to be denied to the owners. According to

the principles being pursued, the fair return is not to be based on the volume of business. And if the bridge earned or would earn, without the improved through highway, an amount equal to a fair percentage on the value of the property, then the improved highway would confer no benefit on the owner and there could be no equity which would justify a reduction in favor of travelers.

The accounts of earnings show that up to the time of opening the improved highway the bridge was not earning enough to give profits such as the Commission regards as reasonable. The net distributable profits in the year 1914, before the improved highway was opened, were $10,711.66, according to the company's books; and the Commission concedes that $21,690 would give fair profits for 1917, when the expenses are assumed to be substantially the same. And it is undoubtedly true that improved highways do in a large measure create new currents of travel, more particularly for automobiles. It is therefore possible that the construction of the improvements did contribute a material part of the earnings within the limits imposed by the reasonable return permitted on the property.

It must be borne in mind, on the other hand, that all utilities have similar advantages conferred upon them. Advantages in all business activities and preparations are reciprocal. Users must find their way to utilities; governmental authorities, at the expense of taxpayers, frequently construct means of access. Ordinarily the advantage conferred by one side to the other in such preparatory steps is not taken into consideration in fixing rates. We do not concede any equity to railroads because of the increase in values they cause along their lines; and on the other hand the construction of a road to a steamboat landing would hardly be taken as ground for reducing the basis of rates for steamboat service. Whether this case can be differentiated seems to me doubtful. However, I can see some justification for an argument that the construction of the through highway for automobiles lifted the bridge to a new and higher utility, and created an earning power without which the bridge would have been unable to earn a fair return despite its high cost, like one built in undeveloped country, a utility built in

the wrong place. If that view can be justified, then the bridge would not have had the value of the money which it would cost to reconstruct it, except for the aid of the State; and there might be an equity in this which would make it fair to deny this full cost as a basis of charges to the public. Upon this consideration I have concluded that I should yield my judgment to that of the Commission on the point.

On the whole question of valuation I am of the opinion that the Commission brought its figure down to such a point that it barely complies with the principles laid down by the authorities for determining the basis of reasonable rates. I cannot say, however, that it is so clearly erroneous that a court should put it aside as unreasonable. As I have stated, I find myself unable to agree with the Commission on several steps in its reasoning. But it would be extraordinary if two separate tribunals did not develop differences in working out such a problem; and the mere existence of differences should not alone require the court to reject the Commission's conclusions. It is expressly provided by the statute, and it is necessary to the convenient, effective working of the system devised for public utility regulation that the court defer to the judgment of the Commission unless the differences be extraordinary and clearly such as should not exist between reasonable men following the proper guiding principles. I have concluded that the differences I have stated would not justify an injunction because of such an unreasonable, erroneous valuation.

## REASONABLENESS OF RETURN.

Coming finally to the question of the return on the valuation, the Commission found the element of gross income to be of necessity a more uncertain quantity than usual. The use of this bridge is in its early stages of development; the volume of traffic has been greatly increasing, and the Commission conclude that it will continue increasing, probably in a descending scale of magnitude. It was considered desirable furthermore that the different rates to be adopted should all be multiples of five, and that requirement would also prevent to some extent the fitting of rates to a given percentage of net distributable income. So the Commission adopted a convenient schedule which according to its calcu-

lation would yield the owners a net return of 8.7 per cent. in the year 1917, and greater percentages according to the expected increases in traffic in later years. These percentages are such as have been held reasonable in many cases, and the court cannot say that they are in themselves unreasonable, if they can be realized. The only questions demanding consideration on this branch of the case are those raised on various items in the calculation by which the Commission arrives at these reasonable percentages. Can the percentages be realized if the items of gross income and expenses are properly allowed for?

The owners object to taking a conjectural estimate of increased business as the basis of gross income. Such a prognostication has obvious disadvantages. The owners are not guaranteed against the results of miscalculation; all the risk is borne by them. But this seems to be one of the difficulties which are inseparable from the effort to regulate the return to owners in future years. In this case the gross income of the past year could not fairly be taken as an estimate of what the years to come will produce; all known facts convince the Commission that it would be too low. And in providing for the future a clear trend must be taken into account. The best that can be done is to make the fairest forecast which the known facts permits, and leave miscalculations to be corrected by further orders. This the Commission has done, and I do not see sufficient ground for rejecting their conclusions on this point.

Of the items of expense allowed, the only one which I can find erroneous is that of taxes. The Commission allowed an annual expense of $500 on this account, and there is conceded to have been an oversight here. The owners themselves in the hearing before the Commission overlooked the liability for Federal taxes, amounting to about $1,000. The States taxes now amount to something under $750 a year. If the exemption from the payment of county and municipal taxes should be held invalid, the total annual outlay for taxes would be over $6,000; but adhering to my conclusion that the exemption should be held valid until set aside, the sum of $1,750 would be the total annual outlay for which allowance should be made. With the valua-

tion of $250,000 left standing, however, and the forecast of the volume of business accepted, the error in the allowance for taxes appears to be insufficient to require the setting aside of the new rates because there will still be a margin of earnings which may reasonably be said to take care of the error and leave a reasonable net return. The error in the allowance, upon my calculation, would amount to $1,250. If this should be deducted from the $21,690 estimated as the net distributable income for 1917 there would still remain for distribution over 8 per cent. on the valuation of $250,000. And I think the court cannot say that will be an unreasonably low return. The returns for the succeeding years are, of course, estimated to yield larger net incomes still.

The Commission has remarked that any error in its predictions can be corrected after the event, and this fact saves much of the difficulty inherent in the problem to be solved. Without this reservation fairness might at least require a greater margin of safety in the return allowed to the owners; with the reservation the only approach to exact justice is left open. And that fact furnishes a strong reason against interference by the court in the Commission's estimates on the various items of account of the business in future years.

Having found no sufficient ground for rejecting the Commission's orders as clearly unreasonable, the injunction is therefore refused; and the bill of complaint will be dismissed, with costs.

I have not examined at all the statement prepared by Mr. Phelps for the Commission after the hearing in court. It must inevitably cause dissatisfaction and a feeling of injustice if one who testifies as an expert, subject to cross-examination and rebuttal, is afterwards put in the position of adviser to the Commission in making up its decision. It may be hard on the Commission to be deprived of the aid of its technical adviser, but in the two functions in the controversy there is a practical inconsistency which I think should be avoided. On this point, therefore, I have sustained the plaintiff's objection, and excluded the statement from consideration.

A decree in accordance with this opinion will be signed when presented.